695 So.2d 157 (1996)
Phillip Wayne TOMLIN
v.
STATE.
CR-93-0824.
Court of Criminal Appeals of Alabama.
June 21, 1996.
Opinion Extended on Grant of Rehearing September 27, 1996.
Certiorari Denied April 25, 1997.
*159 Arthur Madden, Mobile, and Bernard Harcourt, Cambridge, MA, for Appellant.
Jeff Sessions, Atty. Gen., and Tracy Daniel and Andy Poole, Asst. Attys. Gen., for Appellee.
Alabama Supreme Court 1960031.
PATTERSON, Judge.
Phillip Wayne Tomlin was convicted of the capital murders of Ricky Brune and Cheryl Moore, made capital because they were accomplished by one act or pursuant to one scheme or course of conduct. See § 13-11-2(a)(10), Code of Alabama 1975 (repealed 1981).[1] At the sentencing phase, the trial court sentenced Tomlin to death by electrocution, overriding the jury's recommendation that Tomlin be sentenced to life imprisonment without parole.

*160 PROCEDURAL HISTORY
Ricky Brune and Cheryl Moore were found murdered on January 2, 1977. Tomlin and John Ronald Daniels were subsequently arrested for the murders. For his participation in the murders, Daniels was convicted of capital murder pursuant to § 13-11-2(a)(10) (subsequently repealed) (double murder) and § 13-11-2(a)(7) (subsequently repealed) (murder pursuant to a contract or for pecuniary gain), and was sentenced to death by electrocution.[2] For his participation in the murders, Tomlin has been convicted of capital murder in three successive trials and sentenced to death each time he was convicted. This appeal stems from his third trial.

A

The First Trial
On September 22, 1977, Tomlin was charged with capital murder in an indictment alleging that he committed a double murder when he murdered Brune and Moore during the same course of conduct, and that he committed murder-for-hire because he committed the murders pursuant to a contract or for pecuniary gain. He was found guilty of capital murder as charged in the indictment and was sentenced to death by electrocution. In Tomlin v. State, 443 So.2d 47 (Ala.Cr.App. 1979), aff'd, 443 So.2d 59 (Ala.1983), 466 U.S. 954, 104 S.Ct. 2160, 80 L.Ed.2d 545 (1984), this court affirmed his conviction and remanded the cause to the trial court to perfect the sentencing order. On return to remand, we reviewed the trial court's corrected sentencing order and affirmed Tomlin's sentence to death. Tomlin v. State, 516 So.2d 790 (Ala.Cr.App.1986), aff'd, 516 So.2d 797 (Ala. 1987). However, our judgment was ultimately reversed by the Alabama Supreme Court in Ex parte Tomlin, 540 So.2d 668 (Ala.1988) (on Tomlin's second application for rehearing), in which the Supreme Court held that the prosecutor engaged in prejudicial misconduct at Tomlin's trial. In compliance with the Supreme Court's holding, we reversed Tomlin's conviction and remanded the cause to the trial court for further proceedings. Tomlin v. State, 540 So.2d 674 (Ala.Cr.App.1989).

B

The Second Trial
On February 24, 1989, Tomlin was reindicted for the killings under the dual theories of murder-for-hire and double murder. He was retried in 1990. During the course of those proceedings, the trial court granted Tomlin's motion for a judgment of acquittal regarding counts two and three of the indictment, which charged Tomlin with murder-for-hire. The case went to the jury on the charge of double murder. On February 1, 1990, after a jury trial, he was convicted of capital murder. At the sentencing phase of the trial, the jury recommended that Tomlin be sentenced to life imprisonment without the possibility of parole. The trial court overrode the jury's recommendation and sentenced Tomlin to death by electrocution. On appeal, this court held, on several grounds including prosecutorial misconduct, that Tomlin's right to a fair trial had been breached. We, therefore, reversed Tomlin's conviction and remanded the cause to the trial court for further proceedings. Tomlin v. State, 591 So.2d 550 (Ala.Cr.App.1991). The Alabama Supreme Court denied certiorari on January 10, 1992.

C

The Third Trial
On May 28, 1993, Tomlin was reindicted for the murders under two indictments, one *161 charging both murder-for-hire and double murder and the other charging only double murder. The trial court granted Tomlin's motion to dismiss the indictment charging both murder-for-hire and double murder.[3] On November 11, 1993, Tomlin was convicted of capital murder as charged in the remaining indictment, i.e., double murder. Upon a motion made by Tomlin, the trial court accepted, as the advisory verdict in this third trial, the advisory verdict of life imprisonment without parole returned by the jury at the second trial.[4] In the sentencing phase, the trial court again overrode that advisory verdict and sentenced Tomlin to death by electrocution. This appeal follows.
Because we reverse the trial court's judgment, we do not address all of the issues raised on appeal. In addition to the issue requiring reversal, we also address each issue, which, if meritorious, would bar Tomlin's further prosecution for this offense.

FACTS
On January 2, 1977, at about 5:30 p.m., Brune and Moore were found dead in Brune's automobile, which was found on the side of the exit ramp from Interstate 10 outside Mobile, Alabama. Brune had been shot with a .38 caliber weapon, and Moore had been shot with a .38 caliber weapon and a 16-gauge shotgun.
The events leading to these deaths began on November 25, 1975. Brune and Tomlin's brother, who were friends, were tussling in a bedroom of the Tomlin family's furniture store when a shotgun slid down the wall; both boys grabbed for it. Apparently Tomlin's brother touched the trigger, shooting himself in the stomach. The shooting was determined to be accidental. Tomlin's father subsequently asked the police to arrest Brune for the murder of his son. He unsuccessfully pursued the matter with the district attorney. Finally, in a letter dated January 12, 1976, addressed to several persons including the district attorney, he explained his version of the events leading to his son's death and concluded, "Unless some positive action is taken by you within five days, I shall take further action."
On March 19, 1976, while sitting in a bar in Houston, Texas, Tomlin, the appellant, told another patron at the bar, who turned out to be an undercover police officer, that he intended to avenge his brother's death. This conversation was overheard by another undercover officer.
About 11:30 p.m. on January 1, 1977, Tomlin arrived unexpectedly at the trailer of his brothers-in-law, Randy and Danny Shanks in the Mobile area. Tomlin had flown from Houston to New Orleans and had driven a car from New Orleans to Mobile. He stated that he had come to kill Brune, and he asked the Shankses to rent a motel room for him and his companion, Ronald Daniels. In the motel room, the Shankses were shown a couple of pistols and a shotgun or a small rifle. Danny Shanks said that the guns were possibly a .38 revolver, a .44 revolver, and a sawed-off shotgun. Tomlin drove the Shankses back to their trailer in a car owned by Tomlin's sister. Danny Shanks said that during the drive, Tomlin remarked that Daniels was a hit man.
The next day, Danny Shanks went to the motel and awakened Tomlin. About 12:30 p.m. Tomlin drove Shanks back to his trailer. Shanks said that they stopped and put air in the left front tire of the car on the way. Between 3:00 p.m. and 4:00 p.m., James Stokes, a friend and former neighbor of Tomlin's, talked to him in his car outside the Highway 90 Lounge. Stokes saw another person with Tomlin in the front seat of the car.
*162 Around 5:30 p.m. that day, Charles Castro and his wife were traveling east on Interstate 10 in Mobile when they saw a car parked on the Theodore-Dawes Road exit ramp; a body was hanging out the passenger door. They found a law enforcement officer who accompanied them back to the scene, where they discovered the bodies of Brune and Moore. James Small, a state toxicologist, was called to the scene. He examined the bodies and found a large gaping wound in Moore's back and a readily observable wound on her left arm. Brune had a wound to the right side of his head and wounds to the neck and right arm, which were readily observable. Small also found powder burns under the headrest and under the front seat, which indicated a weapon had been fired from the back seat. At the hospital during the autopsy, he saw the physician remove a .38 caliber bullet and 16-gauge plastic wadding from a shotgun shell from Moore's back. Four .38 caliber bullets were removed from Brune's body. The bullets removed from Moore and Brune had been fired from the same gun. Two 16-gauge shotgun shells were subsequently found in a suitcase during a search of Daniels's apartment in Houston.
On January 29, 1977, a 1968 4-door, light green Ford automobile with black vinyl roof was found in the long-term parking lot at the New Orleans airport. The car had been damaged and the left front tire was almost flat. A parking lot ticket found on the right front floor of the interior showed a time and date of 8:08 p.m., January 2, 1977. The car was registered to Tomlin's sister, Brenda Watson. The car was checked for fingerprints, but none could be traced to Tomlin. Eastern Airlines flight 569 had departed New Orleans for Houston at 9:00 p.m. on January 2, 1977. Although Tomlin's and Daniels's names were not on the flight manifest, it was possible to purchase tickets with cash at the gate and in that event no identification was required. A baggage tag from flight 569 was found on a suitcase during a search of Daniels's apartment in Houston.
Tomlin's summary of the events of January 1 and 2, 1977, are entirely different. He stated that he was not in the Mobile area. He stated that he went to a New Year's Eve party with his wife at a friend's house in Houston and that after the party, they accompanied Daniels and his wife to the Daniels's home for breakfast. Tomlin said that later that day, he went home to feed his dog, and that his vehicle got stuck in his driveway. He said that he then walked to his trailer and spent the night of January 1 there. On January 2, Daniels helped him free his pickup truck. According to Tomlin, he spent the night of January 2 with his wife at the Danielses' house.

I.
Tomlin contends that the prosecutor presented insufficient evidence to support a guilty verdict. The state's case-in-chief, as it was presented at Tomlin's two previous trials, has been reviewed on appeal several times by this court and the Alabama Supreme Court. See 540 So.2d 668 (Ala.1988), 591 So.2d 550, (Ala.Cr.App.1991), and 443 So.2d 47 (Ala.Cr.App.1979), aff'd, 443 So.2d 59 (Ala.1983). In each of those prior appeals, Tomlin did not question the sufficiency of the evidence. However, those opinions reviewed Tomlin's case under the doctrine of plain error and did not suggest that the prosecution's case was lacking in any way. Notably, in Tomlin, 443 So.2d 47 (Ala.Cr.App.1979), this court reviewed Tomlin's first trial and expressly held that the evidence in that case was sufficient to support Tomlin's conviction. In this trial, the evidence presented was materially indistinguishable from the evidence at the first trial.
In this third trial, the state's case-in-chief deviated from that of the previous trials in only a few respects.
1. In this trial, the testimony did not establish that all of the shots that killed Moore and Brune were fired from the back seat of the automobile;
2. In this trial, the testimony did not establish the brand of .38 caliber gun that inflicted the wounds;
3. In this trial, the testimony did not establish that Daniels was in fact a "hit man"; however, the testimony did establish that Tomlin represented that he was one.
*163 These minor variations from the evidence presented in Tomlin's prior trials have no material effect on the sufficiency of the evidence presented during the state's case-in-chief. We conclude that in this trial, "even though the evidence is circumstantial, when viewed in a light most favorable to the prosecution, it was sufficient to allow the jury to reasonably find that the evidence excluded every reasonable hypothesis except that of guilt." Daniels v. State, 534 So.2d 628, 636 (Ala.Cr.App.1985), aff'd, 534 So.2d 656 (Ala. 1986), cert. denied, 479 U.S. 1040, 107 S.Ct. 898, 93 L.Ed.2d 850 (1987).

II.
Tomlin contends that the trial court erred by denying his motion to dismiss the indictment. Tomlin alleges that this ruling was erroneous for two reasons, both of which relate to the constitutional prohibition against double jeopardy. See, United States Const. Amend. V; Alabama. Const. of 1901, Art. I, § 9.
Implicit in Tomlin's argument is the question whether, after Tomlin's acquittal in the second trial on the charge of murder-for-hire, double jeopardy prohibits his retrial on any other charge stemming from the same conduct. This issue is resolved by the doctrine of collateral estoppel, which has been applied in double jeopardy cases, as follows: if a prior verdict necessarily adjudicated all the elements of an offense for which a defendant is subsequently charged, double jeopardy principles forbid the defendant's trial on that subsequent charge. See Ashe v. Swenson, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970); Daniels, 534 So.2d at 638 ("[c]ollateral estoppel, a branch of the broader principle of res judicata, bars relitigation, between the same parties, of an issue of ultimate fact determined at a previous trial"). In Tomlin's second trial, the evidence was insufficient to show that Tomlin contracted the murders of the victims, but sufficient to show that Tomlin intentionally caused the death of both victims during the same course of conduct. Considering Tomlin's acquittal on the murder-for-hire charge together with his conviction on the double murder charge at the same proceeding, we conclude that the prohibition against double jeopardy bars only the readjudication of the single issue whether a contract existed between Tomlin and the alleged "hit man," pursuant to which the victims were killed.

A.
Tomlin contends that the prosecutor subjected him to double jeopardy by having him reindicted for murder-for-hire after his second conviction on that charge was reversed. The second trial resulted in Tomlin's acquittal for murder-for-hire and his conviction for double murder.
Before the empaneling and swearing of the jury in Tomlin's third trial, the indictment charging murder-for-hire was dismissed on Tomlin's motion. For purposes of double jeopardy analysis, "[j]eopardy attaches only when a jury has been empaneled and sworn and the indictment has been read to the jury." Coral v. State, 551 So.2d 1181, 1183 (Ala.Cr.App.1989). Therefore, after his second trial, Tomlin was not placed in jeopardy on the charge of murder-for-hire. By correctly dismissing the murder-for-hire charge, the trial court properly protected Tomlin from being placed in jeopardy on a charge as to which he had been previously acquitted.

B.
Tomlin contends that the prosecutor improperly manipulated the grand jury in the current proceedings by presenting to it evidence relating to the murder-for-hire charge, as to which he had been acquitted in the second trial. Tomlin claims that as a result, the grand jury was prejudiced against him and was improperly induced to charge him with double murdera charge that it would, allegedly, not have otherwise returned. Because, as we have previously noted, the grand jury found probable cause to indict Tomlin for murder-for-hire, we presume that the prosecutor presented to the grand jury evidence of an alleged contract. However, the record before us contains none of the evidence presented to the grand jury. Thus, for purposes of our discussion of this issue, we assume that the evidence relevant to a murder-for-hire charge that was presented to the grand jury was the same subsequently *164 presented to the petit jury: (1) that Tomlin referred to Daniels as a "hit man," and (2) that Tomlin stated that he hired Daniels to kill the victims.[5]
Tomlin has failed to present anything in the record that would indicate that the prosecutor did not present sufficient evidence to the grand jury on the charge of double murder.
"`When it appears that witnesses were examined by the grand jury, or that the grand jury had before them documentary evidence, no inquiry into the sufficiency of the evidence is indulged.' Loyd v. State, 279 Ala. 447, 448, 186 So.2d 731 (1966)."
Coral v. State, 551 So.2d 1181, 1182 (Ala.Cr. App.1989). It appears in this case that the grand jury did examine witnesses and documentaries; therefore, we will not address whether that evidence was sufficient to support the grand jury's return of the double murder indictment.
Tomlin's argument is merely that the grand jury considered illegal, prejudicial evidence. However,
"[w]hile an indictment cannot rest `solely' on [illegal] evidence ..., Alsobrook v. Bridges, 43 Ala.App. 145, 146, 182 So.2d 382 (1966), the fact that illegal evidence was considered by the grand jury along with legal evidence does not render the indictment void or subject to being quashed. Aaron v. State, 271 Ala. 70, 77, 122 So.2d 360 (1960)."
Coral, 551 So.2d at 1182. Furthermore, all evidence that would have supported a charge that Tomlin contracted the murders was also relevant to the issue whether Tomlin intentionally caused the deaths of the victims and was in the form of admissible hearsay testimony. Therefore, without question, this evidence was admissible in regard to the double murder charge.
Tomlin's argument is thus reduced to the mere claim that evidence presented to the grand jury was prejudicial. This contention is axiomatic and does not, without more, render that evidence inadmissible. Cf., Oregon v. Kennedy, 456 U.S. 667, 675, 102 S.Ct. 2083, 2089, 72 L.Ed.2d 416, 424 (1982) ("Every act on the part of a rational prosecutor during a trial is designed to `prejudice' the defendant by placing before the judge or jury evidence leading to a finding of guilt."). Based upon the record on appeal, the prosecution did not place Tomlin twice in jeopardy on the charge of murder-for-hire, and the trial court properly allowed the trial to proceed under the indictment that charged him with double murder.

III.
Tomlin contends that the trial court erred by denying his motion to dismiss on the grounds that the third prosecution was barred by the prohibition against double jeopardy because of previous prosecutorial misconduct. See Tomlin, 540 So.2d 668 (Ala. 1988); 591 So.2d 550 (Ala.Cr.App.1991). He argues that the prosecutorial misconduct his previous two trials was in bad faith and was undertaken purely to harass or prejudice him. He further alleges that as a result of the prosecutor's reckless trial tactics, he has been subjected to repeated prosecution on these charges.
The principle of double jeopardy that mostly closely resembles Tomlin's argument is set out in United States v. Dinitz, 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976), as follows:
"The Double Jeopardy Clause does protect a defendant against governmental actions intended to provoke mistrial requests and thereby to subject defendants to the substantial burdens imposed by multiple prosecutions. It bars retrials where `bad-faith conduct by judge or prosecutor,' United States v. Jorn, [400 U.S. 470,] 485, 91 S.Ct. [547,] 557[, 27 L.Ed.2d 543 (1971) ], threatens *165 the `[h]arassment of an accused by successive prosecutions or the declaration of a mistrial so as to afford the prosecution a more favorable opportunity to convict' the defendant. Downum v. United States, [372 U.S. 734, 736, 83 S.Ct. 1033, 1034, 10 L.Ed.2d 100, 102 (1963) ]."
424 U.S. at 611, 96 S.Ct. at 1081, 47 L.Ed.2d at 276 (emphasis added). The gravamen of this principle is that the courts will not allow a prosecutor to circumvent the Double Jeopardy Clause by goading a defendant into nullifying a proceeding by seeking a mistrial, thus resulting in a new trial at a later date. Oregon v. Kennedy, supra, clarified the narrow test to be applied in determining whether a prosecutor's misconduct bars a defendant's retrial on double jeopardy principles:
"Prosecutorial conduct that might be viewed as harassment or overreaching, even if sufficient to justify a mistrial on the defendant's motion, therefore, does not bar retrial absent intent on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy Clause."
456 U.S. at 676, 102 S.Ct. at 2089, 72 L.Ed.2d at 424 (emphasis added).
Although Tomlin relies solely on the Dinitz line of cases, this principle clearly does not support Tomlin's position. Likewise, the rule in Dinitz does not apply to the facts of this caseeither as presented by Tomlin, or as independently gleaned from the record. Tomlin contends only that the prosecutor's habitual misconduct was reckless and that it had the incidental effect of subjecting Tomlin to a Sisyphean crucible.[6] On this point, we agree; however, we know of no double jeopardy principle that forbids successive trials resulting from clumsy prosecutions. See Morrison v. Missouri, 946 F.2d 1340, 1343 (8th Cir.1991), cert. denied, 504 U.S. 959, 112 S.Ct. 2312, 119 L.Ed.2d 232 (1992) ("over-reaching, harassing, intentional and bad faith conduct" does not implicate double jeopardy unless "the prosecutor's conduct was `intended to provoke the defendant into moving for a mistrial.' [Oregon v.] Kennedy, 456 U.S. at 679, 102 S.Ct. at 2091[, 72 L.Ed.2d at 427]"). Tomlin has not alleged that the prosecutor intentionally invited reversal at Tomlin's previous trials, and we have reviewed the record and have found absolutely no facts to support such an allegation. We hold that the trial court's summary denial of Tomlin's motion was proper. Even if all of the factual allegations contained in Tomlin's motion were taken as true, Tomlin would not be entitled to relief.

IV.
Tomlin contends that his rights to a fair trial by an impartial jury, to the free exercise of peremptory challenges, and to due process were violated by the trial court's denial of his motion for a new trial, specifically his allegation of misconduct of juror M.N. He asserts that, despite having been specifically asked during voir dire examination, M.N. failed to disclose that
"he had been the victim of a crime, that he had been exposed to pre-trial publicity, that he recalled the publicity surrounding the crime in 1977, that he visited the Mobile County Courthouse the week before trial and saw Mr. Tomlin surrounded by reporters, that he had a criminal record, that his father had a drug problem and a criminal record, and that he had a friend in law enforcement."
In addressing these allegations, we first turn to the voir dire questions pertaining to each specific subject listed above; to M.N.'s corresponding testimony at the hearing on the motion for a new trial; to M.N.'s affidavit of May 10, which M.N. swore to two days before the hearing and which was admitted into evidence at the hearing; and to defense counsel's memorandums of interviews with M.N. on February 4, 1994, and May 10, 1994, which were admitted into evidence at the hearing.
1. Juror's being a crime victim. During the questioning of the venire, the prosecutor specifically asked, "Has anybody ever had any run-ins with the police? ... Ever been arrested, ever had to call them out to work a burglary or anything like that?" and "Have *166 any of y'all ever been victims of a crime, any type crime?"[7] Defense counsel also asked, "Have any of you been the victim of any type of crime? And by that I mean, anything stolen from you, your car burglarized, or anything like that?"[8] M.N. did not respond to any of these questions.
Yet, the following occurred during his testimony at the hearing on the motion for a new trial:
"Q. [defense counsel:] Have you ever been the victim of a crime?
"A. No.
"Q. Have you ever been robbed?
"A. Yes.
"Q. Could you tell us what happened?
"A. No.
"Q. You don't want to tell us what happened?
"A. No.
"Q. Could you tell us whether the person that robbed you had a gun?
"A. Yes."
M.N.'s testimony revealed that the robbery occurred within six months of Tomlin's trial. In his affidavit, M.N. stated that he had been robbed of $15 by someone armed with a gun. According to defense counsel's memorandum of the February interview with M.N., M.N. recalled having been robbed. According to the memorandum of the May interview, M.N. "talked about ... [having] been robbed a number of times (`all the time,' he said)."
The trial court, in this regard, stated: "I don't know that he understood what a victim meant. Obviously, he didn't because he answered it twice today that he had not been a victim of a crime." The transcript shows that M.N. answered only once that he was not a victim.
2. Juror's exposure to pretrial publicity. During the voir dire questioning conducted by the trial court,[9] the court asked, "[D]id *167 any one of you hear anything about the case by way of media publicity, media coverage by way of newspaper, television, or radio? Anybody?" Then, at the court's request, the prosecutor gave a short rendition of the facts he expected to prove. Thereafter, the court again asked, "Does that jog your memory as to whether or not you heard anything about the case through the news media. Anybody?" M.N. did not respond to either of these questions.
During the voir dire questioning, defense counsel was most concerned with whether any veniremember had seen the November 7, 1993, edition of the Mobile Register, which was published the day before the jury selection process began. The headline story on the front section was: "Prosecutors frustrated by appeals court." Although the subject of the article is the frustration of prosecutors with the appellate courts, the following facts pertinent to Tomlin's prosecution appeared in that article: that Tomlin had been convicted twice, but that each conviction had been overturned by the appeals court and that Tomlin had been incarcerated since his first conviction. On an inside page where the front-page article is continued, a small article, titled "Tomlin Retrial Begins Monday," gives a short synopsis of the facts surrounding the crime. It also states that Tomlin "allegedly hired a hit man" who committed the murders and that the convicted "hit man" was then on death row, having been convicted of the murders.[10]
Although M.N. failed to respond to the voir dire questions on publicity exposure, in the hearing on the motion for a new trial, the following occurred during M.N.s testimony:
"Q. [defense counsel:] Did you read the newspaper on the Sunday before the trial began?
"A. I can't hardly remember.
"Q. What day did the trial start? Do you remember what day the trial started?
"....
"A. It was on [a] Tuesday.
"Q. Do you recall reading any newspapers prior to trial that involved Mr. Tomlin?
"A. Yes.
"Q. Do you remember when the incident in this case actually occurred in 1977?
"....
"A. Yes.
"....
"THE COURT: Mr. N., you say that you read the newspaper right before the trial of the case?
"THE WITNESS: Yes.
"THE COURT: Tell me what that newspaper said about the Phillip Wayne Tomlin case.
"....
"THE WITNESS: A guy killed another guy because his brother, in revenge of his, the guy who killed his brother. And that's all.
"THE COURT: That's all you remember about that?
"THE WITNESS: Yeah, yeah.
"THE COURT: Was there anything in that article that you remember reading that was not brought out in the trial?
"THE WITNESS: I'm not for sure.
"....
"Q. [defense counsel:] Regarding the article in the newspaper before the trial, do you remember whether it said anything about Mr. Tomlin being convicted before?
"A. No.
"....
"Q. Do you remember whether the article said that Mr. Tomlin was on death row?
"A. No, it didn't haveno."
M.N.'s further testimony showed that he was almost nine years' old when this crime occurred *168 and that he delivered newspapers when he was nine. In his affidavit, M.N. admitted that he had read the Sunday article, that he recalled that Tomlin and Daniels were on death row, and that he further recalled (incorrectly) that the article mentioned that Tomlin had been tried three times. M.N. also reiterated in the February interview with defense counsel that he had gleaned these facts from the Sunday article. according to defense counsel's memorandum of that interview. According to defense counsel's notes, M.N. stated in the May interview that he is an avid newspaper reader.
In this regard, the trial court stated, "[I]t appears to me that he is totally confused about when this occurred, how old he was, what he actually read in the newspaper, and what he remembered."
3. Juror's pretrial courthouse visit. M.N. post-trial testimony also revealed that, one week before Tomlin's trial, M.N. went to the courthouse and saw Tomlin surrounded by a group of reporters. In his affidavit, he explained that he "went to see what the trial would be like because [he] was summoned for jury service" and that while he was there he saw Tomlin and reporters. He also acknowledged this incident in his February interview with defense counsel. The trial court commented that the average juror does not take such action. We find that no voir dire question would have elicited this information. Thus M.N.'s failure to disclose this information will not be considered.
4. Juror's criminal record. As noted above, the prosecutor specifically asked, "Has anybody ever had any run-ins with the police? ... Ever been arrested, ever had to call them out to work a burglary or anything like that?" M.N. did not respond.
In regard to whether he had been arrested, M.N. testified as follows in the post-trial hearing:
"Q. [defense counsel:] Mr. M.N., have you ever been convicted of any criminal offense?
"A. No.
"....
"Q. Were you ever convicted of breaking and entering?
"A. Yes."
The defense introduced two case action summaries showing that, in 1987, M.N. had been arrested and charged with breaking and entering two vehicles, Class C felonies, and, as a second count to those charges, had been charged with two counts of criminal mischief in the second degree, a misdemeanor. It appears that he pleaded guilty to the misdemeanor charges. According to defense counsel's memorandum of the February interview, M.N. recalled that he had pleaded guilty to "a misdemeanor, unlawful breaking and entering" in the late 1980s.
5. Father's criminal record. As noted above, the prosecutor specifically asked, "Has anybody ever had any run-ins with the police? ... Ever been arrested, ever had to call them out to work a burglary or anything like that?" The prosecutor had prefaced these questions with the following: "[I]n these questions, let them apply, if they do, to your wife, your husband, your best friend, your brother or sister, if you are extremely close to them." As noted, M.N. failed to respond to these questions.
However, in the hearing on the motion for a new trial, M.N. testified as follows:
"Q. [defense counsel:] Do you know if your father has ever been convicted of a crime or arrested?
"A. Yes.
"Q. What kind of problems has he had with the law?
"A. Drugs.
"....
"Q. [prosecutor:] Do you remember himwhen all that happened when your father was convicted of those crimes?
"A. Yes.
"Q. It says here in the document that Mr. Harcourt gave me that your father has been convicted of about five different crimes; it that true? [[11]]

*169 "A. I don't know was it five.
"Q. But he's been convicted of crimes?
"A. Right."
According to defense counsel's memorandum of the February interview with M.N., M.N. revealed that his father "has had many problems with the law."
In arguing in brief that this nondisclosure was prejudicial, Tomlin contends that M.N.'s father's experience with drugs could have influenced M.N. to be more sympathetic to victim Brune because of Brune's alleged drug addiction and habits.
6. Friend in law enforcement. After telling the veniremembers that the questions were to be applied also to "anyone who you think is friendly enough that you think we would want to know," defense counsel asked,
"[D]o any of you have any sons, daughters, wives, have you in the past when you were in the military or something, ever served in law enforcement? And that could include the man down the street who's a policeman who's one of your friends or the man that you got to know through some case you may have had of a bicycle being stolen or anything, anybody in law enforcement?"
Although M.N. did not respond to these questions, he admitted in the hearing on the motion for a new trial that he has a friend who works in law enforcement with the Mobile Police Department. He also swore to this fact in his affidavit and admitted it in the February interview with defense counsel.
The only voir dire question M.N. answered, besides the questions regarding his marital status and occupation, was defense counsel's question whether M.N. thought the death penalty should be used more often, to which M.N. answered affirmatively. In his argument in support of his motion for a new trial, defense counsel explained that he did not strike M.N., despite M.N.'s response to the death penalty question, because, he said, the issue of punishment was not going to be submitted to the jury and because M.N. did not respond to anything else that was "overly problematic."
At the conclusion of the hearing, the trial court stated:
"I can't think [of] a response that I would take more to heart if I was a defense lawyer than the answer of the juror saying the death penalty is not applied enough in a capital murder case. Now, if you did not see fit to strike him for that answer, then I find it very, very hard to believe that you would strike him because at one point he alleges that someone robbed him but he doesn't know he was a victim of a crime and/or he was convicted of criminal mischief on two occasions. So, apparently, you can see how I'm leaning on that issue."
"We start with the basic constitutional premise that every person is entitled to an impartial jury [pursuant to the Sixth Amendment to the United States Constitution]." Knight v. State, 675 So.2d 487, 493-94 (Ala. Cr.App.1995), cert. denied, 675 So.2d 502 (Ala.1996). "It is fundamental to our system of impartial justice that `"[p]arties have a right to have questions answered truthfully by prospective jurors to enable them to exercise their discretion wisely in exercising their peremptory strikes."`" State v. Freeman, 605 So.2d 1258, 1259 (Ala.Cr.App.1992) (quoting Ex parte O'Leary, 438 So.2d 1372, 1373 (Ala.1983), quoting in turn Ex parte O'Leary, 417 So.2d 232, 240 (Ala.1982)). "Voir dire" is an ancient phrase which literally means "to speak the truth." W. LaFave & J. Israel, Criminal Procedure § 22.3(a) (2d. ed. 1992). "`Where the party has examined the jurors concerning their qualifications, and they do not answer truly, it is manifest that he is deprived of his right of challenge for cause, and is deceived into foregoing his right of peremptory challenge.'" Ex parte Ledbetter, 404 So.2d 731, 733 (Ala.1981) (quoting Leach v. State, 31 Ala.App. 390, 18 So.2d 285, cert. denied, 245 Ala. 539, 18 So.2d 289 (1944)). "Failure to enforce the right to elicit from prospective jurors truthful answers to material questions renders hollow the right of peremptory challenge." Knight *170 v. State, 675 So.2d at 494 (quoting Mitchell v. State, 458 So.2d 819, 821 (Fla.Dist.Ct.App.1984)).
In addressing the issue whether a defendant was deprived of the right to exercise peremptory strikes based on truthful answers from prospective jurors, the Alabama Supreme Court recently reiterated the test to be "whether the defendant might have been prejudiced by a veniremember's failure to make a proper response." Ex parte Stewart, 659 So.2d 122, 124 (Ala.1993) (emphasis added). This test casts a "light burden" on the defendant. Cf. Ex parte Lasley, 505 So.2d 1263, 1264 (Ala.1987) (stated in regard to the test of whether juror misconduct might have influenced the verdict).
"`Although the factors upon which the trial court's determination of prejudice is made must necessarily vary from case to case, some of the factors which other courts have considered pertinent are: temporal remoteness of the matter inquired about, the ambiguity of the question propounded, the prospective juror's inadvertence or willfulness in falsifying or failing to answer, the failure of the juror to recollect, and the materiality of the matter inquired about.'"
Johnson v. State, 536 So.2d 957, 958 (Ala.Cr. App.1987), cert. denied, 490 U.S. 1046, 109 S.Ct. 1955, 104 L.Ed.2d 424 (1989) (quoting Smithson v. State, 50 Ala.App. 318, 320-21, 278 So.2d 766 (1973)). See also Campbell v. Williams, 638 So.2d 804, 813 (Ala.1994), cert. denied, 513 U.S. 868, 115 S.Ct. 188, 130 L.Ed.2d 121 (1994). "Thus, the facts in each case must be considered individually and much will remain in the discretion of the trial judge." Parish v. State, 480 So.2d 29, 30 (Ala.Cr.App.1985). We turn to the facts before us.
a. Temporal remoteness. With the two exceptions of M.N.'s knowledge of the crime through pretrial publicity that appeared immediately after the crime was committed and of his arrests and convictions, the matters inquired about are not temporally remote from the trial. Although his arrests and convictions occurred 16 years before Tomlin's trial, we find this temporal remoteness to be insignificant. Obviously, these proceedings were his only experience with the criminal justice system, and, because of that, they most likely would have made an impression. In regard to the other matters inquired about, M.N. had been a crime victim within the six months before trial. He had read the newspaper article the day before the voir dire questioning. (We find it unreasonable to conclude from M.N.'s sketchy rendition of the contents of the article at the hearing on the motion for a new trial that that rendition was all the information he had gleaned from the article; six months had lapsed between his reading the newspaper article and his testifying at the hearing, while only one day had lapsed between his reading the newspaper article and his voir dire questioning. Moreover, according to the memorandum of the February interview and to his affidavit, M.N. recalled that information of the article that is clearly prejudicial.) Four of his father's arrests occurred within the 15 months before Tomlin's trial. Finally, his testimony, his affidavit, and the memorandum of the February interview speak of his law enforcement friend in the present tense. In conclusion, most of this information is not temporally remote from the voir dire questioning; rather it is very close in time. Accordingly, temporal remoteness of the sought-after information can not be used either to excuse M.N.'s failure to respond to the questions truthfully or to diminish the importance and influence of the information in regard to any bias M.N. might have had.
b. Ambiguity of questions. With two exceptions, the questions under review are not ambiguous. Those two exceptionsthe questions about a relative's experience with the police and about any friend in law enforcementare only slightly ambiguous, but clear enough to have elicited from M.N. the information not disclosed. In regard to M.N.'s failure to disclose his father's criminal record, we note that the precise question asked by the prosecutor did not specifically include the veniremember's parents: "[I]n these questions, let them apply, if they do, to your wife, your husband, your best friend, your brother or sister, if you are extremely close to them." However, we consider that the gist of this qualification indicates that the *171 questions apply to any one the veniremember is close to. Compare Davis v. State, 51 Ala.App. 200, 283 So.2d 650 (1973) (where the precise question was whether the veniremember or the veniremember's spouse had been in law enforcement, the juror had no duty to disclose the fact that his father had been a circuit solicitor). See also Ex parte Ledbetter, 404 So.2d at 733 (where the court found the questions asked to be subject to two "equally possible" interpretations, applied one interpretation, and found the juror's failure to answer to warrant a new trial). Although the trial court concluded, in regard to the question whether any veniremember had been a crime victim, that M.N. did not understand the meaning of the term "victim," there is no indication from M.N. on the record before us that he did not understand the voir dire questions. Compare Thomas v. State, 622 So.2d 415, 418 (Ala.Cr. App.1992), cert. denied, 622 So.2d 420 (Ala. 1993). He was not questioned on the reason or the motive for failing to truthfully answer. For the most part, the questions clearly called for disclosure of the information that M.N. failed to disclose.
c. Juror's inadvertence or wilfulness. We are most concerned with this factor"the prospective juror's inadvertence or willfulness in falsifying or failing to answer." Because of M.N.'s failure to answer numerous questions truthfully, we do not find credible any notion that M.N.'s repeated failure to disclose was due to inadvertence or negligence. His failure to answer truthfully occurred too many times and the questions called for too broad a range of information for us to find his conduct to have been inadvertent or negligent. We do note however that even if disclosure is unintentional, if it is prejudicial, "the result is the same as if it had been deliberate." Alabama Gas Corp. v. American Furn. Galleries, 439 So.2d 33, 36 (Ala.1983). In fact, even his testimony at the hearing on the motion for new trial appears to reflect a conscious disregard and disrespect for the importance of truthful responses to questioning in a judicial forum.
d. Juror's failure to recollect. In this regard, we find that M.N.'s failure to truthfully answer is more probably attributable to his total disregard for truthful disclosure than to a failure to recollect. He was neither asked whether he could recall nor did he volunteer as an explanation that he could not recall. The only reference to his failure to recollect is to the publicity shortly after the crime. The failure to recollect the media coverage 17 years before this trial is completely irrelevant to what we consider to be the critical publicity: the publicity immediately before this trial. As noted above, we consider M.N.'s failure to remember all of the details of the article that was published the day before trial started must be attributed to the passage of time between his reading the article and the hearing on the motion for a new trial; this is no indication of his recollection during the voir dire questioning of the article appearing the day before. Moreover, as evidenced by the memorandum of the February interview and M.N.'s affidavit, M.N. recalled the prejudicial information in the article. Thus, we must disagree with the trial court's observation that M.N. was "totally confused" about what he had read in the newspaper and what he remembered. Moreover, as we also discussed above, too many of the matters inquired into were remarkably close in time to Tomlin's trial.
e. Materiality. In his argument in support of his motion for a new trial, defense counsel stated that his first concern, in exercising his jury strikes, was to strike those who "were concerned with the publicity." He further stated that he was also concerned with those who had been victims of crimes, i.e., who may have felt more sympathy than others for the victims in this case, and those people affiliated with law enforcement.
Defense counsel asked questions specifically to elicit information on these three subjects. In addition to asking whether any veniremember had been the victim of a crime and whether any had a close association with a member of law enforcement, he was allowed to question individually those veniremembers who indicated that they had been exposed to pretrial publicity. "[I]nformation sought on voir dire is material if the questioning attorney considers it important in making the decision to excuse a prospective juror." Gold Kist, Inc. v. Brown, 495 So.2d *172 540, 546 (Ala.1986). As the trial court in Gold Kist noted, "Questions propounded during the interrogation of the panel indicated that the attorneys in this case considered the question material." Id. at 545.
In regard to the consideration of exposure to pretrial publicity, we understand defense counsel's particular concern to remove from the venire any member who had read the Sunday paper. As noted above, the article stated that Tomlin's codefendant had been convicted and that he was on death row awaiting execution for the murders. It was, among other grounds, upon the prosecutor's disclosure of this same information, i.e., that the codefendant had been convicted and was on death row, that Tomlin's second trial was reversed. See Tomlin v. State, 591 So.2d 550, 553-56 (Ala.Cr.App.1991). The court explained in Tomlin:
"As the Eleventh Circuit Court of Appeals stated in United States v. McLain, 823 F.2d 1457 (11th Cir.1987):
"`In most occasions, the admission of a co-defendant's guilty plea will substantially affect the defendant's right to a fair trial in that "the jury may regard the issue of the remaining defendant's guilt as settled and that the trial is a mere formality." United States v. Griffin, 778 F.2d 707, 711 (11th Cir.1985).'

"McLain, 823 F.2d at 1465. `The basic rationale underlying the holdings that this is prejudicial error is that it is irrelevant and incompetent because it infers that since the confederate was guilty the defendant must therefore be guilty ... and violates the defendant's right to be tried on his own.' State v. McCarthy, 567 S.W.2d 722, 724 (Mo.Ct.App.1978). An accused is `entitled to have the question of his guilt determined upon the evidence against him, not on whether a codefendant or government witness has been convicted of the same charge.' [United States v. ]Miranda, 593 F.2d [590,] 594 [(5th Cir.1979) ]."
591 So.2d at 555. Defense counsel rightfully considered the veniremembers' exposure to publicity his main priority in questioning the venire and in striking the jury. Compare Beauregard v. State, 372 So.2d 37, 41 (Ala. Cr.App.1979), cert. denied, 372 So.2d 44 (1979) (defendant was not prejudiced by six jurors' failure to disclose that they had read a newspaper article about the homicide two months before the trial where the article was "a fair and accurate account which substantially and briefly relates the same testimony [a witness] gave at trial" and where the article did not "evoke prejudice against the appellant or elicit sympathy for the deceased"). The circumstances before us illustrate an important aspect of voir dire examination: to overcome any prejudicial impact of pretrial publicity by identifying those veniremembers influenced by the publicity. See generally W. LaFave & J. Israel, supra, at § 23.2(d). "The theory here is that the voir dire examination of prospective jurors will reveal which of them have actually been exposed to the pretrial publicity and what effect that exposure has had upon them." Id. This purpose was thwarted in this case by M.N.'s failure to answer truthfully.
In regard specifically to M.N.'s failure to disclose that he had been the victim of a crime, we agree with Tomlin that Ex parte Ledbetter, provides guidance for determining the materiality of such information. In that case, a juror, who was a former deputy sheriff, was asked as a veniremember if he or a close member of his family had been the victim of a violent crime or of "any sort of criminal activity." He failed to disclose that five months before the trial he and his wife were asleep in their home when the underpinning of the house and their two vehicles were struck by gunfire. While the Ledbetter Court found it significant that the juror was a former deputy sheriff, we find Ledbetter to be authority for the general proposition that probable injury could result from a juror's failure to disclose any experience as a crime victim because that juror could be less indifferent to someone charged with a crime than a juror who was not a crime victim. The Court stated:
"The nature of the shooting incident, ... with its potential for personal injury as well as property damage springing from the use of actual force, directed against [the juror], nevertheless was activity which, as a general proposition, would have *173 naturally caused a former deputy sheriff juror to stand less indifferent to someone charged with a forceful crime than a layman, `free from the tug of ... former professional influences.'"
404 So.2d at 734.
Moreover, we find guidance, not only for the materiality question of the crime victim status, but for the question of exposure to pretrial publicity in the following:
"Questions that ask venirepersons whether they know any of the individuals involved in the case, whether they know any of the facts of the case, and whether any of the venire has ever been the victim of a crime are all important considerations that determine the impartiality and fairness of a trial proceeding. When these questions and others are answered falsely, either by vocal assertions or by intentional or indifferent silence, which in many cases is perhaps the most detrimental, an accused is denied his right to challenge for cause and has in fact been deceived into forgoing his right of a peremptory strike."
Warrick v. State, 460 So.2d 320, 325 (Ala.Cr. App.1984).
Thus, it is beyond question that at least three of the areas inquired aboutexposure to pretrial publicity, crime victim status, and association with a member of law enforcementwere material. We recognize that some of the undisclosed information provides reasons regularly advanced by the prosecution for its exercise of a peremptory strike. For example, we can take judicial notice that the fact that a person related to a venireperson has been prosecuted for a criminal offense or has been associated with some illegal activity is often a reason for the prosecution to exercise a peremptory strike. Thomas v. State, 622 So.2d at 418. However, as we have found, at least three subjects of inquiry were material.
We summarize as follows our conclusions as to the factors upon which the trial court's determination of prejudice was to have been made: the majority of the sought-after information is not temporally remote from the voir dire questioning; most of the questions are not ambiguous; N.M.'s failure to respond appears to have been willful; he did not exhibit any indication that his failure to respond was the result of a failure to recollect; and at least three subjects about which defense counsel questioned the venire were obviously material, with the disclosure of exposure to pretrial publicity being crucial to empaneling an impartial jury. We also find that M.N. was neither asked nor did he volunteer any explanation as to why he did not respond to the voir dire questions, e.g., that he did not hear the questions, that he did not understand them, that he did not think that they applied to his facts, or that he did not recollect. Furthermore, M.N. was neither asked nor did he volunteer any indication of whether the undisclosed information had any effect on his ability to reach a fair and true verdict. Compare Thomas v. State, 622 So.2d at 418-19 (juror's failure to disclose, in response to the question of whether a family member had been a criminal defendant, the facts that her son had pleaded guilty to theft and was waiting in the county jail to go to "boot camp" did not warrant a new trial, where the juror testified that she did not understand the question or know the meaning of the word "defendant," that she tried to answer the questions to the best of her ability, that the undisclosed facts did not influence her verdict, and that the facts did not come up in the deliberations); Limbaugh v. State, 581 So.2d 5, 8-9 (Ala.Cr.App.1991) (juror's failure to disclose that her daughter had been the victim of a car bombing that remained unsolved did not create reversible error where the question calling for the information was ambiguous and where she testified that the circumstances surrounding her daughter's death had no effect whatsoever upon her ability to reach a fair and true verdict); Latimore v. State, 534 So.2d 665, 668 (Ala.Cr.App.1988) (juror testified that he did not acknowledge that he "knew of" the victim because he felt that he could "give a fair and impartial judgment"). See also Ex parte Lasley, 505 So.2d at 1264 (in regard to the test of whether juror misconduct might have influenced the verdict, "Application of the rule cannot in all cases depend entirely upon the jurors' statements that the extraneous information did not affect their verdict."); Johnson v. State, 536 So.2d at 959 ("The fact *174 that the juror testified at the hearing on the motion for a new trial that his relationship to the deputy sheriff [which he had not disclosed] did not affect his ability to judge the appellant fairly would not overcome the prejudice to the appellant.").
From these facts and conclusions, we find that, although the trial court was admittedly in a better position to evaluate the question of possible prejudice, the court clearly abused its discretion in denying Tomlin's motion for a new trial. The only express findings by the trial court supporting its ruling are (1) that, because M.N. did not answer twice in the hearing on the motion for a new trial that he had been a crime victim, he obviously did not understand the meaning of the term "victim"; (2) that, in regard to exposure to publicity, M.N. was "totally confused about when [the crime] occurred, how old he was, what he actually read in the newspaper, and what he remembered"; and (3) that, because defense counsel did not strike M.N. for responding that the death penalty is not applied frequently enough, it is "very, very hard to believe" that counsel would strike him on the grounds that he was a crime victim and that he had been twice convicted of criminal mischief. In regard to (1), we again note that only once in the hearing did M.N. not answer that he was a victim. Moreover, we find that the term "victim" was adequately explained in defense counsel's comment incorporated in his voir dire question about crime victims: "And by that I mean, anything stolen from you, your car burglarized, or anything like that?" Without any further express finding by the trial court, we cannot find support for the trial court's finding that M.N. did not understand the question. In regard to (2), again we note that, irrespective of M.N.'s failure to recall that publicity that immediately followed the crime and irrespective of his failure to remember in detail six months after Tomlin's trial the contents of the article he read the day before the trial, he admitted reading that prejudicial article. Moreover, as reflected by the memorandum of the February interview and by his affidavit, he recalled the prejudicial information in the article. Finally, in regard to (3), it was defense counsel's opinion that the veniremembers' view on capital punishment was irrelevant because the issue of punishment was not going to be submitted to the jury. In fact, before questioning the venire, defense counsel moved that the venire not be death qualified, which motion the trial court denied.
We can only conclude from M.N.'s failure to disclose the above-cited information, that he has a strong proclivity to answer falsely by "intentional or indifferent silence," which as the Warrick court noted, can be more detrimental than answering falsely by vocal assertions, 460 So.2d at 325. Because of M.N.'s repeated disregard for his duty under oath to answer the voir dire questions discussed above truthfully, we are gravely concerned that he failed to answer truthfully the court's questioning relating to the fundamental principles underlying our criminal justice system: those questions relating to the presumption of innocence, the state's burden to prove the defendant guilty beyond a reasonable doubt, and the absence of any duty of the defendant to present any evidence or give any testimony. (In fact, M.N.'s total disregard to his oath and his responsibility to answer the court's and the parties' questions truthfully support the inference that M.N. also had a total disregard for the trial court's jury charge.) As defense counsel responded when the trial court was trying to narrow the prejudicial effort in concrete terms, "We were prejudiced by the fact that he did not answer any question truthfully, Your Honor." Because of the number of questions not truthfully answered by M.N., we do not find defense counsel's inference to be unreasonable.
Tomlin had a right to know the information that M.N. refused to disclose so that he could knowingly exercise his peremptory strikes. "[W]e cannot abide by a practice allowing potential jurors to deprive defendants in criminal actions of the right to truthfully know jurors' biases and thus prevent defendants from properly utilizing their jury strikes and ultimately resulting in probable prejudice." Warrick v. State, 460 So.2d 320 at 325. Because of M.N.'s deception, Tomlin was denied his Sixth Amendment right to be tried by an impartial jury.

*175 "If these legal stipulations, to an accused, are to be more than the mumbling of a meaningless shibboleth, they should here have play to effect a reversal of the cause, to the end that this defendant receive the benefit of the privilege sought to be guaranteed."
Ex parte Ledbetter, 404 So.2d at 733 (quoting Leach v. State, 31 Ala.App. at 392, 18 So.2d at 287).
In so holding, we adopt the conclusion in Knight v. State, 675 So.2d at 496, where the court reversed the appellant's capital murder conviction and death sentence for a juror's failure to truthfully answer questions put to the jury venire:
"This case will not withstand the many years of appellate review, both in state and federal courts, that follow a conviction and sentence to death. The jury's verdict was tainted by the inclusion in the jury of the juror discussed in this opinion. This court must reverse the appellant's conviction and remand this cause for a new trial or for other proceedings not inconsistent with this opinion."
In conclusion, we further find that the defense proved at the hearing on the motion for new trial another juror's failure to respond truthfully to voir dire questioning: juror G.W.Y. failed to disclose that, at the time of Tomlin's trial, a charge of possession of cocaine was pending against him. The case action summaries of G.W.Y.'s convictions, which were introduced in the hearing on the motion for new trial, show that G.W.Y. was arrested for possession of cocaine and for driving under the influence of alcohol on August 27, 1993; that he was bound over to the grand jury on September 30, 1993; that he was indicted for possession and driving under the influence on January 28, 1994; that on March 25, 1994, on motion of the state and with G.W.Y.'s consent, a count charging possession of drug paraphernalia was added to the possession indictment, and G.W.Y. pleaded guilty to the paraphernalia charge and the driving under the influence charge; and that he was sentenced pursuant to a plea bargain arrangement to one year's imprisonment, which was suspended, and he was placed on two years' probation, on each conviction, with the two sentences to run concurrently. The jury selection in Tomlin's case took place on November 8, 1993, at which time, G.W.Y. was waiting to be indicted by the grand jury.
G.W.Y.s panel was asked by the trial court,
"Do any of you know of any reason why you could not serve as a juror in this case, listen to the testimony or evidence as it comes from the witness stand and exhibits that may be introduced into evidence, listen to the law as I give it to you at the conclusion of the presentation of the evidence, and return a fair and impartial verdict based on the facts as you find them as a jury and the law as I give it to you as a Judge? Do any of you know of any reason why you could not do that?"[12]
The prosecutor asked,
"A lot of times lawyers think they can ask every question that they're supposed to. I never have been able to do it, so I'm going to have to ask you, if there's something that you are sitting there thinking, well, if Don Valeska would just ask me `X,' I would tell him `Y.' And there's no way for me to do that. I can't look inside y'all's heads. The Judge will tell you that the State of Alabama and the Defendant are entitled to a fair trial. And if there's something that's bugging you about this case that I just haven't pushed the right button or asked the right question, you know, feel free to bring it up later, tell Judge McDermott, in any way before the jury is picked."
A veniremember is allowed to remain silent until a question demanding a response. Parish v. State, 480 So.2d 29, 30 (Ala.Cr.App.1985); Thomas v. State, 338 So.2d 1045, 1047 (Ala.Cr.App.1976). We find that the above-cited questions sufficiently called for G.W.Y. to disclose his pending grand jury investigation. Cf. Ex parte Poole, 497 So.2d 537, 539 (Ala.1986) (prejudicial error occurred because one juror should have disclosed her pending prosecution and another *176 juror should have disclosed his two district court convictions for issuing worthless checks when they were asked, "Have you ever had any problems or conflicts with any law enforcement officer, no matter how small or large they might be, got in a fuss with one about something, I don't know just the kinds of things I anticipate with that question, but have you ever had any problems?") We further note that, although there is no indication that the prosecutors had knowledge of the pending action against G.W.Y., had the prosecutors known, we believe considerations of basic fairness would have created an affirmative duty on the part of prosecutors to make the disclosure.
Defense counsel's introductory remarks to his questioning of M.N.'s panel were,
"[T]his is a very, very important part of this process because this is where at this point in the trial, both the State and the Defense have the same objective. And that is, we try to get to know as much about y'all as we can so that we can select what we feel would be the most fair and the most impartial jury."
Had this been taken to heart by M.N., this case would not have to be once again reversed. However, we cannot condone M.N.'s failure to disclose, for to do so would render hollow the right of peremptory challenge. Whether considering M.N.'s failure alone or cumulatively with G.W.Y.'s failure to disclose, we are constrained to reverse and remand this case to the trial court.
REVERSED AND REMANDED.
All Judges concur, except COBB, J., who is not sitting.

ON APPLICATION FOR REHEARING
PATTERSON, Judge.
The attorney general correctly points out, in regard to Part IV of our original opinion, that the specific incident of the robbery of juror M.N., upon which we mainly rely in finding that M.N. did not truthfully answer the question whether he had been a victim of a crime, could possibly have occurred after the trial and before M.N.'s February 4 affidavit. However, this possibility does not invalidate our ruling. According to the memorandum of the May interview, M.N. "talked about [having] been robbed a number of times (`all the time,' he said)."
OPINION EXTENDED; RULE 39(k) MOTION DENIED; APPLICATION FOR REHEARING GRANTED; AFFIRMED.
All Judges concur, except COBB, J., who is not sitting.
NOTES
[1] "`The 1975 capital punishment statute, as contained in §§ 13-11-1 through 13-11-9, was carried over intact to the new criminal code as§§ 13A-5-30 through 13A-5-38. These sections of the new criminal code were repealed, effective July 1, 1981, by the capital offense statute, but only as to conduct occurring on or before July 1, 1981. Therefore, conduct occurring before July 1, 1981, as in the present case, is governed by the pre-existing law, i.e., §§ 13A-5-30 through 13A-5-38. See Spears v. State, 428 So.2d 174 (Ala.Cr.App.1982).' Ex parte Tomlin, 516 So.2d 797 (Ala.1987), footnote 1. (The capital offense statutes are currently contained in §§ 13A-5-40 et seq.)." Tomlin v. State, 591 So.2d 550, 552 n. 1 (Ala.Cr.App.1991).
[2] Daniels's conviction and sentence were ultimately affirmed on direct appeal, see Daniels v. State, 406 So.2d 1023 (Ala.Cr.App.) (reversing Daniels's conviction), cert. denied, 406 So.2d 1024 (Ala.1981), vacated and remanded, 457 U.S. 1114, 102 S.Ct. 2920, 73 L.Ed.2d 1325 (1982), on remand, 534 So.2d 628 (Ala.Cr.App.1985) (affirming Daniels's conviction, vacating death sentence, and remanding cause to trial court for resentencing), aff'd, 534 So.2d 656 (Ala.1986), cert. denied, 479 U.S. 1040, 107 S.Ct. 898, 93 L.Ed.2d 850, on return to remand, 534 So.2d 658 (Ala.Cr.App.1987) (affirming Daniels's death sentence imposed on remand), aff'd, 534 So.2d 664 (Ala.1988), cert. denied, 488 U.S. 1051, 109 S.Ct. 884, 102 L.Ed.2d 1007 (1989), and affirmed on collateral appeal, see Daniels v. State, 650 So.2d 544 (Ala.Cr.App.1994), cert. denied, 514 U.S. 1024, 115 S.Ct. 1375, 131 L.Ed.2d 230 (1995).
[3] The grounds for dismissal of this indictment was that retrial on the murder-for-hire charge would violate double jeopardy principles. It appears that the double murder count of that indictment was dismissed as a matter of administrative convenience.
[4] Cf. Poland v. Arizona, 476 U.S. 147, 152, 106 S.Ct. 1749, 1754, 90 L.Ed.2d 123, 131 (1986) (interpreting Bullington v. Missouri, 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981), to hold that "the jury's decision to sentence [a defendant] to life imprisonment after his first conviction should be treated as an `acquittal' of the death penalty under the Double Jeopardy Clause").
[5] Although we have held that double jeopardy is not implicated at preindictment stages of a proceeding, we note that the principles of double jeopardy do not render this evidence inadmissible at this trial. Whether Tomlin in fact made these statements was a mere evidentiary issue not an "`ultimate fact .... upon which [Tomlin's] liability or exoneration depend[ed].'" Fort v. State, 668 So.2d 888 (Ala.Cr.App.1995) (quoting State v. Bolden, 639 So.2d 721 (La.1994), (Ortique, J. dissenting), cert. denied, Bolden v. Louisiana, 513 U.S. 1077, 115 S.Ct. 724, 130 L.Ed.2d 629 (1995)).
[6] In Greek mythology, Sisyphus was a Corinthian king and was condemned to spend eternity rolling a heavy boulder up a hill. Each time he would approach the summit, the boulder would slip his grasp and roll to the bottom of the slope, and he would begin anew.
[7] The prosecutor's additional questioning of M.N.'s panel was brief. He also asked if any veniremember or family members has been represented by defense counsel's firms, present and past; if any one had any problems with the death penalty; if any one was "morally, physically, or philosophically" opposed to the death penalty; if any one knew someone on death row or serving a sentence of life imprisonment without possibility of parole; if any one would be bothered by the state's reliance on circumstantial evidence in a death penalty case; if any one would require the state to produce an eyewitness in a prosecution where death is a possible punishment; if any one knew John Ronald Daniels (the convicted accomplice); if any one had a problem with the state's reading the prior testimony of a witness now deceased; if any one had had any contact with any one in the Eight Mile area and might have heard about this case; if any one knew specified members of Tomlin's family; and if any one had served on a jury. The prosecutor ended his voir dire examination with the following:

"Now, a lot of times lawyers think they cover everything in asking questions to potential jurors, but I can't do that. So, I'm going to have to ask you since I can't look inside your mind, if there's anything that I haven't asked that you would want to tell us about this case or about serving on this case, please don't hesitate to do it.
"You may be thinking, `Well, if he'd just ask me A, I can tell him B.' But if there's anything that bothers you about this case, please don't hesitate to bring it up or tell Judge McDermott."
[8] Defense counsel also asked if any one belonged to a community crime watch group; if any one had been a victim of a crime; and if any one thought that the death penalty is not imposed in enough cases.
[9] The court's voir dire examination was also brief. After each veniremember on M.N.'s six member panel stated his or her occupation and marital status, the trial court asked the following questions: whether any one served on the grand jury that considered this case; whether any one was related to or acquainted with Tomlin, either of the victims, any lawyer on the staff of the attorney general, any of the specified state's witnesses, any of the defense attorneys, or any of the specified defense witnesses; whether any one had personal knowledge of the facts; whether any one had any problem with the concepts of the presumption of innocence, the state's burden to prove the defendant guilty beyond a reasonable doubt, and the absence of any responsibility on the defendant's part to present any evidence or to give any testimony; whether any one believed that the indictment of a person is an indication that that person is probably guilty of the offense charged; whether the possibility that the defendant could be sentenced to death if convicted presented any problem to any veniremember; whether any one had a religious, philosophical, or moral belief that he or she could not serve as a juror in a criminal case in judgment of another; whether sequestration would cause any hardship. In addition, the court asked:

"Do any of you know of any reason why you could not serve as a juror in this case, listen to the testimony as it comes from the witness stand, take, of course, into consideration any physical exhibits, documents, photographs that may be introduced into evidence, listen to the law as I give it to you at the conclusion of the presentation of the evidence, and return a fair and impartial verdict based on the facts as you find them as a jury and the law as I give it to you as the Judge? Do any of you know of any reason why you could not do that?"
[10] Because the small article is incorporated by placement within the continuation of the front page article, we will refer to these two articles as one, i.e., the Sunday article.
[11] The prosecutor is obviously referring to defense exhibit 14, the Mobile County sheriff's notarized list of five arrests of M.N.'s father for the following: stalking, criminal trespass, criminal mischief in the third degree (three charges), assault in the third degree, and harassment. One of the arrests occurred a week after Tomlin's trial, two others occurred in 1993, and the other two occurred in 1992. This exhibit was marked, but the trial court sustained the prosecutor's objection to its admission.
[12] We note that, unlike M.N.'s panel, G.W.Y.'s panel was not asked if any venire member had ever had any run-ins with the police or had ever been arrested.