REL: February 9, 2024

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0649), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# Alabama Court of Criminal Appeals

## OCTOBER TERM, 2023-2024

_____

## CR-21-0199

_____

## Marquise Deshawn Flynn

### v.

## State of Alabama

## Appeal from Montgomery Circuit Court
## (CC-18-1178)

McCOOL, Judge.

Marquise Deshawn Flynn appeals his conviction for murder made capital because it was committed with the use of a deadly weapon while the victim was in a vehicle. See § 13A-5-40(a)(17), Ala. Code 1975. The

trial court sentenced Flynn to life imprisonment without the possibility of parole.

Facts and Procedural History

In July 2018, a Montgomery County grand jury indicted Flynn for two counts of capital murder. One count alleged that Flynn had intentionally caused the death of Sylvester Morris by shooting him with a gun while Morris was in a vehicle, see § 13A-5-40(a)(17); the other count alleged that Flynn had intentionally caused Morris's death in the course of committing first-degree robbery, see § 13A-5-40(a)(2), Ala. Code 1975.

Flynn was brought to trial in February 2020. On the second day of trial, one of the State's witnesses, Oscar Lozano, testified that he saw Flynn shoot Morris. On cross-examination, Lozano testified that he had been shown a photograph of Flynn at some point before trial, that he had been told that the person in the photograph had been charged with Morris's murder, and that he had confirmed at that time that the person in the photograph was the person he had seen shoot Morris. In a bench conference that occurred after Lozano's testimony, defense counsel claimed that he had "specifically asked" the prosecutor, Michael Green, if Lozano was "going to come [to trial] and say that he saw … [Flynn]

shoot and kill somebody" and that Green had "said, no, [Lozano was] not going to do that." (Supp. 1, R. 817.) Thus, according to defense counsel, the State had "pretty much ambushed Flynn … with bringing in an eyewitness to the shooting and not making [the defense] aware of it," and counsel moved for a mistrial on that basis. (Id., R. 818.) Green denied making any statements to defense counsel regarding the substance of Lozano's testimony; instead, Green claimed instead that he had told defense counsel that he "didn't know what [Lozano] was going to say because [he had not yet] talked to him" but that he "thought [Lozano] would be a very important witness." (Id.) Green also argued that defense counsel could have spoken with Lozano before trial and chose not to do so. Thus, Green argued that granting a mistrial based on the alleged "ambush" would be "ridiculous." (Id., R. 823.) The trial court denied the motion for a mistrial, and the trial continued.

After the trial recessed for the day, defense counsel filed a written motion for a mistrial, and the trial court held a hearing on that motion the next morning. In support of that motion, defense counsel alleged that Lozano's out-of-court identification of Flynn had occurred under "clearly suggestive" circumstances (Supp. 1, R. 986.) – namely, "a one-man

3

showup" (id., R. 985) – and that, had counsel been aware of those circumstances, he would have filed a motion to suppress Lozano's testimony. Defense counsel also argued that the State had violated Brady v. Maryland, 373 U.S. 83 (1963), by not informing him that Lozano had implicated Flynn because, according to counsel, "how the identification was made, what the circumstances were of that, [could have been] used to impeach Lozano." (Supp. 1, R. 991.) Green then explained the circumstances under which Lozano had first implicated Flynn:

> "When I ultimately spoke with Mr. Lozano …, he started describing through an interpreter [(Lozano's primary language is Spanish)] a tall, thin man that I assumed at the time was the victim in this case because he's taller and he's a slender man. And [Lozano] says, 'No, the shooter was a tall, thin guy.'
>
> "And I stood up … and I said, 'How did he look in comparison to me …?' He said, 'He was almost your same body style.' And that concerned me, because, as everybody can see in here, I am neither tall nor thin.
>
> "So I asked Mr. Lozano, 'Is this the shooter you're talking about or the guy they pulled out of the car?' That's when the language barrier got brought into play.
>
> "That's when I said, 'Ben Gibbons [(another prosecutor)], show him a picture' – and I can't remember whether I said show him the jail photo or he said the only thing we've got is the jail photo. And I said, 'Show it to Mr.

4

Lozano.' And I'm like, 'Is this the guy you're talking about as the shooter.' He said, 'Yeah, that's the guy I'm talking about as the shooter.'

"That is distinguished from a lineup or a one-man showup. I wanted to make sure that Mr. Lozano is not describing another shooter or not describing the situation that would be a <u>Brady</u> violation for me to keep concealed if there had been a self-defense situation or if Mr. Lozano did, indeed, see someone who was tall and thin, not just somebody he considers tall and thin.

"That's why the picture was shown to him. It wasn't for purposes of making an identification. It wasn't by a police officer. They didn't go over to his house. It was to make sure that my witness and [I] were on the same page as to who he was talking about."

(<u>Id.</u>, R. 1000-02.) The trial court found that the circumstances under which Lozano had implicated Flynn were "absolutely, positively suggestive" (<u>id.</u>, R. 1010-11) and that, as a result, the court "would not have allowed [Lozano] to testify as an in-court identification of [Flynn]" if defense counsel had been afforded the opportunity to file a motion to suppress Lozano's testimony. (<u>Id.</u>, R. 1018-19.) Thus, the trial court granted Flynn's motion for a mistrial.

Following the mistrial, Flynn filed a motion to dismiss the indictment, arguing that a second trial would violate the prohibition against double jeopardy found in both the Fifth Amendment to the

5

United States Constitution and Article I, § 9, of the Alabama Constitution. Flynn conceded that there is usually no double-jeopardy bar to a second trial when a mistrial is granted on the defendant's motion, but, citing Oregon v. Kennedy, 456 U.S. 667 (1982), he argued that there is an exception to that rule if the State intentionally provoked the defendant into moving for the mistrial, which, according to Flynn, was what occurred in his first trial. Flynn also argued that he was entitled to have a jury determine "whether the prosecution improperly intended to provoke a mistrial." (C. 188.) Alternatively, Flynn noted that "[t]he Kennedy rule has been criticized by several state courts as being too narrow" (C. 205), and he cited several cases in which other state appellate courts have held that their respective state constitutions bar retrial when a defendant moves for and is granted a mistrial based on intentional prosecutorial misconduct, regardless of whether the misconduct was intended to provoke a mistrial.

The trial court held a hearing on Flynn's motion and heard testimony from Ben Gibbons and Green, the two prosecutors in Flynn's first trial, and their testimony established that Gibbons, Green, and Maria Eady, a translator, had conducted "witness prep" with Lozano on

6

the day Flynn's first trial began. (Supp. 1, R. 1024.) Gibbons testified that, before that meeting occurred, he and Green had no reason to believe that Lozano would be able to identify Morris's murderer and that the original purpose of Lozano's testimony was simply to prove that Morris was in a vehicle at the time of his death, which was a necessary element of one of the capital-murder charges. Gibbons testified, however, that Lozano had told the prosecutors during that meeting that he "saw the guy that was shooting and … he was tall and thin," and, according to Gibbons, Flynn is neither tall nor thin. (Id., R. 1042.) Given Lozano's description of the shooter, Gibbons became concerned that the State "might have charged the wrong person with murder" (id.) and that there might be a self-defense issue that would need to be brought to defense counsel's attention because Lozano's description of the shooter actually matched Morris. However, Gibbons also recognized that "there was a language discrepancy" that could have been the cause of the confusion. (Id., R. 1033.) Thus, Gibbons conceded that Green had then shown Lozano a photograph of Flynn, that Green had told Lozano that the person in the photograph was the person charged with Morris's murder, that Lozano had confirmed that the person in the photograph was the

7

person he saw shoot Morris, and that the prosecutors had not informed defense counsel of what had occurred during the meeting. Gibbons testified, though, that the purpose of showing Lozano a photograph of Flynn was simply "to make sure that [the State] had the right person" (id.), and Gibbons testified that there was no "plan or any intention on the part of [the prosecutors] to set up a scenario whereby [they] could get a mistrial if [they] needed one." (Id., R. 1044.)

Green's testimony regarding the events that occurred during the "witness prep" was consistent with Gibbons's testimony, as were Green's concessions that Lozano's description of the shooter raised the possibility that the State "flat out [had] the wrong person charged with capital murder" and raised possible Brady and self-defense issues. (Supp. 1, R. 1080.) Green testified, however, that once Lozano confirmed that Flynn was the shooter, he did not believe there was any exculpatory evidence to provide to defense counsel. Green also testified as follows:

> "Q. Throughout … your preparation for this trial and conduct for this trial, was it ever your intent to have a mistrial declared?
>
> "A. No.
>
> "Q. Was it ever your intent to come up with a plan to find out some evidence and not tell the defense and hold it in

8

> your back pocket just in case you needed it, then you could spring it and get a mistrial and maybe get a second try?
>
> "A. No. I didn't want a mistrial. I thought the trial was going very well. I thought that our witnesses had done very well. And, quite frankly, I think [we] were going to get a conviction.
>
> "Q. At the time that the mistrial was declared, did you feel like you were in pretty good shape as far as trials go?
>
> "A. I thought we were in great shape.
>
> "Q. And, certainly, you argued vigorously against both of those mistrials, successfully the first time and not so successfully the second time?
>
> "A. That's correct. I did not want a mistrial either time. I had a lot of the same folks that are sitting out here watching these proceedings, my boss, other folks were very displeased with me for getting a mistrial. I did not want a mistrial no way, shape, or form."

(Id., R. 1094-95.)

Following the arguments of counsel, the trial court denied Flynn's motion to dismiss the indictment and, in support of its ruling, stated:

> "I think there is considerable disagreement as to whether the showing of the picture to Mr. Lozano was suggestive. I found at the time during the trial that showing the picture to Mr. Lozano was suggestive and granted a mistrial because of that. I find as a matter of fact that there was no intent whatsoever on behalf of the State to either goad or to cause a mistrial in this case. In fact, I agree with the assertions of counsel for the State that things were going very well for the prosecution

9

and there very well may have been a conviction. I find there is no jury question whatsoever about whether or not Mr. Green was guilty of prosecutorial misconduct. And there will be no questions or no assertions at the next trial as to whether he committed prosecutorial misconduct. I find that there was no jeopardy attached in this matter at all and that the State's motion to retry the case is granted and we're going to set this case for trial."

(Supp. 1, R. 1129-30.)

The trial court subsequently issued a written order in which it set forth further findings in support of its ruling. First, the trial court found that there had not been any prosecutorial misconduct in Flynn's first trial, and the court clarified that it had not granted the mistrial on that basis. Rather, the trial court explained, it had granted the mistrial because it was concerned that Lozano's testimony, to the extent it implicated Flynn, might not have been admissible and wanted "to allow further litigation concerning the admissibility of the identification." (C. 253.) The trial court also found that there was no evidence indicating that the State had intentionally provoked Flynn into moving for the mistrial. In support of that finding, the trial court noted that the State had "argued vehemently against the granting of the mistrial" (id.) and that "the timing of the alleged misconduct" supported the State's argument that it had not harbored such intent. (C. 254.) Thus, the trial

10

court stated that there was "no doubt in the court's mind that the State wished to continue trying the case to its conclusion." (C. 253.) As for Flynn's request for a jury trial, the trial court found that he was not entitled to a jury trial on the issue of the State's intent because he had not presented substantial evidence to support the conclusion "that there was any intent on the part of the prosecutor to 'goad' him into a mistrial." (C. 255.)

After the trial court issued its written order, Flynn filed a petition for a writ of mandamus with this Court, in which he argued that he was entitled to have a jury determine whether the State had intentionally provoked him into moving for the mistrial. On May 28, 2021, this Court issued an order denying Flynn's petition on the basis that he had failed to present substantial evidence that could support a finding of such intent. See Ex parte Flynn (No. CR-20-0613, May 28, 2021), 357 So. 3d 76 (Ala. Crim. App. 2021) (table).

Flynn's second trial began on Monday, November 15, 2021. On the Saturday before the trial began, defense counsel filed notice of his intent to impeach the credibility of one of the State's witnesses, Zathian Webster, with evidence indicating that Webster has been convicted of

11

making a false statement to a police officer. On Monday, the trial court held a hearing at which the State argued that Webster's conviction was inadmissible because, according to the State, defense counsel had not provided sufficient advance notice of his intent to use the conviction at trial. Defense counsel claimed in response that he "didn't find [the conviction] until Friday" (R. 31), and the trial court asked counsel why he had not "already been down to the municipal court and checked on stuff like this," to which counsel replied: "Well, we had looked, Judge, and we didn't see it." (R. 32.) After hearing rebuttal argument from the State, the trial court ruled that defense counsel could not introduce evidence of Webster's conviction because counsel had "waited too late to let the State know." (R. 33.)

Following jury selection, defense counsel again raised the argument that he should be allowed to impeach Webster's credibility with evidence of Webster's conviction. After allowing defense counsel to make additional arguments, the trial court stated that it was adhering to its original ruling, i.e., that evidence of Webster's conviction was inadmissible because "notice was too late." (R. 174.) Defense counsel then informed the court that, instead of presenting evidence of Webster's

12

conviction, he intended to "simply ask Webster when he's on the stand if he's ever lied to law enforcement officers." (R. 175.) The trial court ruled, however, that defense counsel was "not allowed to ask the question that would elicit from [Webster] whether or not he lied to police officers." (R. 237.)

At Flynn's second trial, the State was not represented by Green and Gibbons, and Lozano did not testify. The evidence the State did present at that trial tended to establish the following facts. On June 28, 2015, Deandre Hale was hosting a party at his house, and Morris was in attendance. At one point during the party, Hale was standing in his front yard with his guests when he witnessed an "altercation" at Morris's car (R. 192), which was parked "across the street." (R. 211.) Specifically, Hale testified that he saw Morris, who was in his car, "tussling" with someone who was standing outside the car, and that, during the altercation, the person standing outside the car fired a gun. (R. 193.) Hale then ran back to his house to retrieve a firearm, and, when he returned to the front yard, other guests at the party were "shooting back and forth" with the person who had shot Morris. (R. 196.) Hale could not identify the shooter, but he testified that his guests told him during the

13

exchange of gunfire that Flynn had shot Morris. Hale drove Morris to a hospital, where he died later that night.

Webster, who is Flynn's cousin, testified that he had given Flynn a ride to Hale's party and that he then went to his own house, which was three blocks from Hale's house. Approximately 30 minutes later, Webster heard gunshots, and he testified that, "within two or three minutes after [he] heard the gunshots" (R. 250), two of his family members telephoned him and told him that "[Flynn] just killed [Morris]." (R. 253.) Webster also testified that, at some point later that night, Flynn came to his house. Webster did not mention to Flynn that he had heard about the shooting, but he asked Flynn if he was "all right" because Flynn was "pacing and … sweating," and, according to Webster, Flynn then admitted that he had shot Morris because Morris had "tried [him]." (R. 257.) Webster testified that he encouraged Flynn to surrender himself to the police but that Flynn said he "ain't going out like that" and that the police were "going to have to catch [him]." (R. 297.) Willie Watts, who was also at Webster's house at that time, corroborated Webster's testimony, testifying that he heard Webster "ask [Flynn] was he all right,

14

and [Flynn] told [Webster] that he shot [Morris]." (R. 308.) Watts also testified that he did not see Flynn with a gun at that time.

Parrish Anderson was driving past Hale's house at the time of the party and stopped in the street to talk to Morris. As Anderson was driving away following that conversation, he heard two gunshots and then circled the block to return to the scene. As Anderson approached Hale's house again, he saw Flynn moving at a "steady pace" away from the scene with a gun in his possession. (R. 344.)

At the close of the State's evidence, Flynn moved for a judgment of acquittal. The trial court granted that motion with respect to the charge alleging that Flynn had intentionally caused Morris's death during the course of committing first-degree robbery, but the court denied the motion with respect to the charge alleging that Flynn had intentionally caused Morris's death by shooting him with a gun while Morris was in a vehicle. The jury convicted Flynn of that capital-murder charge, and he was sentenced to life imprisonment without the possibility of parole.

## Discussion

Flynn raises the following four claims on appeal: (1) that his second trial violated the double-jeopardy provisions of both the United States

15

Constitution and the Alabama Constitution, (2) that the trial court erred by prohibiting him from impeaching Webster's credibility, (3) that the trial court erred by admitting inadmissible hearsay, and (4) that the trial court erred by giving one of the State's requested jury instructions. We address each claim in turn.

## I. Double Jeopardy

Flynn claims that his second trial violated the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution. In conjunction with that claim, Flynn argues that the trial court erred by denying his request to have a jury to determine whether the State had intentionally provoked him into moving for the mistrial that was granted in his first trial. Flynn also claims that his second trial violated Article I, § 9, of the Alabama Constitution, which, like the Fifth Amendment, protects a defendant from being twice placed in jeopardy of life or limb for the same offense. We address those constitutional claims separately.

### A. Double Jeopardy under the United States Constitution

The Double Jeopardy Clause of the Fifth Amendment, which was made applicable to the states in Benton v. Maryland, 395 U.S. 784 (1969), provides that no person shall be "subject for the same offense to be put

twice in jeopardy of life or limb." Thus, a clear violation of the Fifth Amendment occurs when a defendant is again prosecuted for the same offense following a conviction or an acquittal. State v. Esco, 911 So. 2d 48, 49 (Ala. Crim. App. 2005). Whether the Fifth Amendment bars another trial following a mistrial, however, i.e., when there has been neither a conviction nor an acquittal, is not as clear-cut and depends on the circumstances of the mistrial. See Woods v. State, 367 So. 2d 982, 983 (Ala. 1978) ("Whether being placed on trial after a mistrial is declared constitutes double jeopardy depends upon the circumstances surrounding the mistrial.").

Typically, "when a mistrial is declared on a defendant's motion[,] a retrial is not barred by the prohibition against double jeopardy," State v. Darling, 878 So. 2d 323, 326 (Ala. Crim. App. 2003), because "the Double Jeopardy Clause 'does not relieve a defendant from the consequences of his voluntary choice.'" Oliver v. State, 479 So. 2d 1385, 1390 (Ala. Crim. App. 1985) (quoting United States v. Scott, 437 U.S. 82, 99 (1978)). However, in Kennedy, supra, the United States Supreme Court recognized an exception to this general rule. "When the prosecutor's actions were intended to goad the defendant into moving for a mistrial[,]

17

then the State is barred from prosecuting the defendant in a second trial." Darling, 878 So. 2d at 326. See also In re R.E.D., 304 So. 3d 1170, 1172 (Ala. 2020) ("'"[T]he circumstances under which … a defendant [who moves for a mistrial] may invoke the bar of double jeopardy in a second effort to try him are limited to those cases in which the conduct giving rise to the successful motion for mistrial was intended to provoke the defendant into moving for a mistrial."'" (quoting Kinard v. State, 495 So. 2d 705, 707 (Ala. Crim. App. 1986), quoting in turn Kennedy, 456 U.S. at 679)). Whether the State intended to provoke a mistrial is based on the "objective facts and circumstances" of the case. Kennedy, 456 U.S. at 675.

A defendant who alleges that the State intentionally provoked him into moving for a mistrial might be entitled to have a jury resolve the question of the State's intent. However,

"[b]efore a criminal defendant is entitled to a jury trial on the issue of prosecutorial intent, the criminal defendant must present substantial evidence that could rationally support a conclusion that the State acted intentionally to goad the criminal defendant into filing a motion for a mistrial. Although prosecutorial intent is a factual issue, see Ex parte Ryals, 819 So. 2d 114, 116 (Ala. Crim. App. 2001) ('The question of the prosecutor's intent [is] a question of fact, not a question of law.'), in this context the criminal defendant must present substantial evidence creating a factual issue to be decided by a jury before he or she is entitled to a jury trial.

18

"To create a question of fact to be decided by the jury, the evidence presented by the criminal defendant in support of a motion for a jury trial on prosecutorial intent must support the conclusion that the State committed misconduct with the intent of goading the defendant into requesting a mistrial. A criminal defendant must do more than allege that the State's actions prejudiced him or her. As the United States Supreme Court noted: 'Every act on the part of a rational prosecutor during a trial is designed to "prejudice" the defendant by placing before the judge or jury evidence leading to a finding of guilt,' Kennedy, 456 U.S. at 674, 102 S. Ct. 2083; such acts are simply part of the adversarial process. A criminal defendant must also allege more than mere legal or factual error by the State; there must be evidence indicating that the State committed such error with the intent to goad the defendant into filing a motion for a mistrial in violation of principles of double jeopardy. See Spears v. State, 647 So. 2d 15, 22 (Ala. Crim. App. 1994) ('"The requirement of intent is critical, and easily misunderstood. The fact that the government blunders at trial and the blunder precipitates a successful motion for a mistrial does not bar a retrial. [Oregon v. Kennedy, 456 U.S. 667,] 674-76, 102 S. Ct. [2083,] 2088-90 [(1982)]; Illinois v. Somerville, 410 U.S. 458, 93 S. Ct. 1066, 35 L. Ed. 2d 425 (1972); United States v. Powell, 982 F.2d 1422, 1429 (10th Cir. 1992); United States v. Perez Sanchez, 806 F.2d 7 (1st Cir. 1986).'" (quoting United States v. Oseni, 996 F.2d 186, 188 (7th Cir. 1993))). The criminal defendant must present substantial evidence indicating that the State committed misconduct with the intent to goad the defendant into filing a motion for a mistrial."

R.E.D., 304 So. 3d at 1175-76 (footnotes omitted).

We first consider Flynn's claim that he was entitled to have a jury determine whether the State had intentionally provoked him into moving for the mistrial that occurred in his first trial because, if he was, then we

19

must remand for the trial court to conduct that trial. In support of that claim, Flynn cites Ex parte Adams, 669 So. 2d 128 (Ala. 1995), in which the Alabama Supreme Court held that there were "factual … questions about whether the prosecutor acted improperly and intentionally to provoke the first mistrial," which entitled the defendant to a jury trial on that issue. Id. at 132. However, in that case there was substantial evidence supporting the defendant's allegation that the State had intentionally provoked him into moving for the mistrial. Specifically, the evidence indicated that the prosecutor had asked a witness an improper question and could not justify the question when the trial court asked him to do so; had "injected race into th[e] case for no purpose" id. at 130; and had admitted at one point that he was "afraid [the] jury [was] going to acquit the defendant." Id. at 131. In addition, it does not appear that the prosecutor had argued against the mistrial.

This case is distinguishable from Adams because Flynn presented no evidence, much less substantial evidence, indicating that the State had intentionally provoked him into moving for the mistrial that occurred in his first trial. Indeed, Flynn has already presented this Court with this claim in a petition for a writ of mandamus, and the Court

20

unanimously denied that petition on the basis that Flynn "did not present 'substantial evidence that could rationally support a conclusion that the State acted intentionally to goad [him] into filing a motion for a mistrial.'" (C. 263 (quoting R.E.D., 304 So. 3d at 1175).) We see no basis in the record for reaching a different conclusion now.[1] To the contrary, Green vigorously argued against a mistrial each time Flynn moved for one, and he testified at the hearing on Flynn's motion to dismiss that he "did not want a mistrial [in any] way, shape, or form" because he "thought the trial was going very well" and that the State was "going to get a conviction." Gibbons likewise testified that there had not been any "plan or any intention on the part of [the prosecutors] to set up a scenario whereby [they] could get a mistrial if [they] needed one." Perhaps the most significant fact, though, is that the State's alleged misconduct occurred before Flynn's trial started. "[L]ogically, it would seem that prosecutorial conduct occurring pretrial could rarely form the basis for

---

[1]Although this Court has already considered this argument in Flynn's petition for a writ of mandamus, Flynn is not barred from raising it again in this appeal. See Ex parte Shelton, 814 So. 2d 251, 255 (Ala. 2001) ("'[T]he denial [of a petition for a writ of mandamus] does not operate as a binding decision on the merits.'" (quoting R.E. Grills, Inc. v. Davison, 641 So. 2d 225, 229 (Ala. 1994))).

21

applying the [Kennedy] exception … since the prosecutor would hardly intend to abort a trial before it has even started." Thanos v. State, 330 Md. 576, 590, 625 A.2d 932, 938 (1993) (citation omitted). See also Giddins v. State, 163 Md. App. 322, 361, 878 A.2d 687, 710 (2005) (noting, in holding that there was no evidence of the State's intent to provoke a mistrial, that the State had strenuously argued against a mistrial and that "[t]here would have been no conceivable reason to sabotage the trial" at the time of the State's alleged misconduct, which had occurred almost immediately after its first witness began testifying). Compare Adams, supra (evidence of the State's intent to provoke a mistrial stemmed from actions the prosecutor took during the trial). Thus, we once again conclude that Flynn failed to present "substantial evidence that could rationally support a conclusion that the State acted intentionally to goad [him] into filing a motion for a mistrial" in his first trial. R.E.D., 304 So. 3d at 1175.

We acknowledge Flynn's argument that a jury might not have found Green and Gibbons to be credible witnesses, which, according to Flynn, raised a jury question as to whether the State had intentionally provoked him into moving for the mistrial. However, "[a]lthough

prosecutorial intent is a factual issue, <u>in this context</u> the criminal defendant must <u>present</u> substantial evidence <u>creating</u> a factual issue to be decided by a jury before he or she is entitled to a jury trial." <u>R.E.D.</u>, 304 So. 3d at 1175-76 (emphasis added; internal citation omitted). Flynn's mere hope that a jury might not find Green and Gibbons to be credible is not a substitute for that burden.  To hold otherwise would virtually ensure that a defendant would be entitled to a jury trial on the issue of the State's intent in every case involving an allegation that the State had intentionally provoked the defendant into moving for a mistrial.  Moreover, Flynn's hope that a jury might not find Green and Gibbons to be credible witnesses ignores the objective circumstances of this case, which provide no basis whatsoever for finding that the State intentionally provoked him into moving for the mistrial and, to the contrary, provide strong evidence indicating that the State neither intended to provoke nor desired a mistrial.

We also acknowledge Flynn's argument that there was "considerable conflicting evidence on the issue of the [State's] intent." (Flynn's brief, p. 37.)  In support of that argument, Flynn points to defense counsel's "testimony" that Green had told counsel that Lozano's

testimony would not implicate Flynn. However, defense counsel did not testify at the hearing on Flynn's motion to dismiss – a fact the trial court noted at the hearing (Supp. 1, R. 1112) – and counsel's arguments and allegations were not evidence. Shanklin v. State, 187 So. 3d 734, 783 (Ala. Crim. App. 2014). Moreover, even if defense counsel had testified to that effect, Flynn fails to explain how Green's alleged pre-trial deception serves as evidence of the State's intent to provoke a mistrial in a trial that had yet to begin.

In short, the record in this case provides no basis for finding that the State intentionally provoked Flynn into moving for the mistrial that occurred in his first trial. Thus, the trial court did not err by refusing to submit the issue of the State's intent to a jury. The fact that there is no basis for finding that the State intentionally provoked Flynn into moving for the mistrial is also dispositive of Flynn's claim that the Fifth Amendment barred his second trial.[2] See Kennedy, 456 U.S. at 679 ("Since … the prosecutorial conduct culminating in the termination of the

---

[2]We acknowledge Flynn's reliance on United States v. Sterba, 22 F. Supp. 2d 1333 (M.D. Fla. 1998), but that case, in addition to the fact that it is not controlling in this jurisdiction, is factually distinguishable.

first trial in this case was not so intended by the prosecutor, that is the end of the matter for purposes of the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution."); and State v. Moore, 969 So. 2d 169, 180 (Ala. Crim. App. 2006) ("Based on the Supreme Court's decision in [Kennedy], … the determination of whether a retrial is barred based on prosecutorial misconduct in a first trial comes down to one question – was the prosecutor's conduct intended to provoke a mistrial.").

## B. Double Jeopardy under the Alabama Constitution

Flynn claims that, even if his second trial was not barred by the Fifth Amendment, it was barred by Article I, § 9, of the Alabama Constitution (hereinafter "Section 9"), which, like the Fifth Amendment, protects a defendant from being twice placed in jeopardy of life or limb for the same offense. Specifically, Section 9 provides that "no person shall, for the same offense, be twice put in jeopardy of life or limb; but courts may, for reasons fixed by law, discharge juries from the consideration of any case, and no person shall gain an advantage by reason of such discharge of the jury." The fact that the United States Constitution and the Alabama Constitution both contain a double-jeopardy provision does not mean that the two constitutions provide the

25

same double-jeopardy protection. "While the Federal Constitution, as interpreted by the United States Supreme Court, establishes minimum standards, the states have the power and are free to provide greater safeguards and to extend this protection through their own organic law – the State Constitutions." Gilbreath v. Wallace, 292 Ala. 267, 271, 292 So. 2d 651, 654-55 (1974). Thus, while Fifth Amendment double-jeopardy claims are subject to the standard set forth in Kennedy, supra, Section 9 might provide broader double-jeopardy protection than the Kennedy standard affords.

As we explained in Part I.A, supra, the Kennedy standard provides a single, limited exception to the rule that, "when a mistrial is declared on a defendant's motion[,] a retrial is not barred by the prohibition against double jeopardy." Darling, 878 So. 2d at 326. Only when the State intentionally provoked the defendant into moving for a mistrial will double-jeopardy principles come into play. Kennedy, supra. Flynn argues, though, that the Kennedy standard is too narrow to encompass the full panoply of double-jeopardy protection afforded by Section 9. In support of that argument, Flynn notes that "several states have … abandon[ed] the narrow test prescribed in Kennedy in favor of a more

general and reasonable standard." (Flynn's brief, pp. 38-39.) According to Flynn, those states have concluded that the double-jeopardy provisions in their state constitutions bar the retrial of a defendant who seeks and is granted a mistrial based on intentional prosecutorial misconduct that was so prejudicial that it could be remedied only by a mistrial, regardless of whether the State intended to provoke a mistrial. Thus, relying on those cases, Flynn asks this Court to interpret Section 9 in like manner.[3]

We have not found an Alabama case that has expressly addressed whether the Kennedy standard applies under the Alabama Constitution.[4] However, there are cases that provide some insight into this issue.

---

[3]If there was no intentional prosecutorial misconduct in Flynn's first trial, then this claim would lack merit even under the broader standard that Flynn proposes, which would obviate any need for us to consider the claim. And the trial court did conclude that there was no prosecutorial misconduct in Flynn's first trial. However, the facts regarding the State's alleged misconduct are undisputed, and whether that conduct actually amounted to misconduct is a question of law, not a question of fact entitled to a presumption of correctness. Knight v. State, 300 So. 3d 76, 89 (Ala. Crim. App. 2018).

[4]One commentator has concluded that a majority of state courts "have adopted the Kennedy standard under their state constitutions" and, citing Ex parte Cochran, 500 So. 2d 1179 (Ala. 1985), contends that Alabama is among those states. Emily McEvoy, When Double Jeopardy Should Bar Retrial in Cases of Prosecutorial Misconduct: A Call for

27

In <u>Tomlin v. State</u>, 695 So. 2d 157 (Ala. Crim. App. 1996), the defendant was convicted of capital murder a third time after his first two convictions for that offense were overturned by this Court on appeal; in both appeals, the conviction was reversed, at least in part, based on prosecutorial misconduct. On appeal from his third conviction, the defendant relied on the prosecutorial misconduct that had occurred in his first two trials to argue that his third trial violated "the constitutional prohibition against double jeopardy." <u>Id.</u> at 163. This Court did not clarify which constitution the defendant had cited in support of his claim, but the Court cited both the Fifth Amendment and Section 9 after setting forth the defendant's argument. The Court then proceeded to explain the standard set forth in <u>Kennedy</u> and held that there was no double-

<u>Broader State Protections</u>, 122 Colum. L. Rev. 173, 188 (2022). We also note that this Court, when composed of different judges, stated that <u>Kennedy</u> was "adopted by the Alabama Supreme Court in <u>Ex parte Cochran</u>." <u>Moore</u>, 969 So. 2d at 180.

However, in discussing the defendant's double-jeopardy claim in <u>Ex parte Cochran</u>, the Alabama Supreme Court did not discuss or even mention the Alabama Constitution, much less hold that the <u>Kennedy</u> standard applies under the Alabama Constitution. Rather, the Court clearly stated that the issue in that case was whether the defendant's "<u>Fifth Amendment</u> right not to be placed in jeopardy twice for the same offense" had been violated. 500 So. 2d at 1181 (emphasis added). Thus, this Court is not convinced that <u>Ex parte Cochran</u> resolved this issue.

28

jeopardy violation because the defendant had not alleged that the State had "intentionally invited reversal at [his] previous trials." Tomlin, 695 So. 2d at 165.

In Darling, supra, trial court declared a mistrial because the jury was unable to reach a unanimous verdict. The defendant then moved to dismiss the indictment "based on double jeopardy" (CR-02-1950, Petition, Exhibit B), arguing that the jury's inability to reach a unanimous verdict had been the result of prosecutorial misconduct, and he "requested a jury trial on the issue whether the prosecutor's actions were intentional." Darling, 878 So. 2d at 325. The trial court granted the request for a jury trial, and the State subsequently sought mandamus relief in this Court. In addressing the State's petition, the Court first noted, as it did in Tomlin, that the Fifth Amendment and Section 9 "both prohibit subjecting a defendant to multiple prosecutions for the same offense." Darling, 878 So. 2d at 325. The Court then noted that, "when a mistrial is declared on a defendant's motion[,] a retrial is not barred by the prohibition against double jeopardy," subject to the exception set forth in Kennedy, i.e., that "[w]hen the prosecutor's actions were intended to goad the defendant into moving for a mistrial[,] then the State is barred from

prosecuting the defendant in a second trial." Darling, 878 So. 2d. at 326. Thus, because the mistrial in that case had been granted because of a hung jury, and not because of prosecutorial misconduct, the Court held that a jury trial on the issue of the State's intent was unnecessary.

There are also several cases in which this Court has applied the Kennedy standard in rejecting a double-jeopardy claim but has not clarified whether the Fifth Amendment or Section 9 was at issue; instead, the Court simply referred to "double jeopardy," without citing either the United States Constitution or the Alabama Constitution. See Ex parte Taylor, 720 So. 2d 1054, 1056 (Ala. Crim. App. 1998) (referring only to "principles of double jeopardy"); Spears v. State, 647 So. 2d 15, 21 (Ala. Crim. App. 1994) (holding that "[p]rinciples of jeopardy" did not bar the defendant's second trial); and Graham v. State, 590 So. 2d 375, 377 (Ala. Crim. App. 1991) (stating that the defendant's argument was that "his right not to be placed in jeopardy twice for the same offense was violated").

None of the cases we have cited expressly held that the Kennedy standard applies under the Alabama Constitution. However, Tomlin and Darling acknowledged both the Fifth Amendment and Section 9 and then

relied on <u>Kennedy</u> in addressing a double-jeopardy claim, and <u>Taylor</u>, <u>Spears</u>, and <u>Graham</u> relied on <u>Kennedy</u> without making any attempt to draw a distinction between the two constitutional provisions. Arguably, then, this Court has already implicitly determined that the <u>Kennedy</u> standard applies under the Alabama Constitution. We realize, though, that the appellants in those cases might not have argued, as Flynn has, that Section 9 provides broader double-jeopardy protection than the <u>Kennedy</u> standard affords, and appellate courts typically address only those arguments that an appellant makes. <u>Thompson v. State</u>, 97 So. 3d 800, 808 (Ala. Crim. App. 2011). However, even if those cases did not conclusively resolve this issue, several factors weigh against Flynn's argument.

First, Section 9 expressly states that "no person shall, for the same offense, be twice put in jeopardy of life or limb; <u>but courts may, for reasons fixed by law, discharge juries from the consideration of any case, and no person shall gain an advantage by reason of such discharge of the jury</u>." (Emphasis added.) Thus, on its face, Section 9 appears to provide that double-jeopardy principles do not come into play in <u>any</u> case that involves a mistrial, provided that the mistrial was granted "for reasons

31

fixed by law." In other words, Section 9 appears to provide <u>less</u> double-jeopardy protection than the <u>Kennedy</u> standard affords. <u>See</u> <u>State v. Oliver</u>, 188 Ga. App. 47, 49, 372 S.E.2d 256, 259 (1988) ("If anything, the Georgia Constitution is less protective than the Fifth Amendment, for it recognizes an exception to the bar against double jeopardy when the first trial ends in mistrial."). We recognize, of course, that "[t]he Alabama Constitution affords no less protection to its citizens than that afforded by the United States Constitution," <u>Ford v. State</u>, 356 So. 2d 720, 722 (Ala. Crim. App. 1978), and we are not suggesting that Section 9 does in fact provide less double-jeopardy protection than the Fifth Amendment provides. The point is that the express language of Section 9 certainly does not support the conclusion that Section 9 provides <u>broader</u> double-jeopardy protection than the Fifth Amendment provides.

Second, in <u>Gholston v. State</u>, 57 So. 3d 178, 184 (Ala. Crim. App. 2010), this Court stated:

> "The Supreme Court of the United States has held that the Double Jeopardy Clause of the Fifth Amendment contains three protections: 'It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense.' <u>North Carolina v. Pearce</u>, 395 U.S. 711, 717, 89 S. Ct. 2072, 23 L. Ed. 2d 656 (1969) (footnotes omitted), overruled on other

32

grounds, <u>Alabama v. Smith</u>, 490 U.S. 794, 109 S. Ct. 2201, 104 L. Ed. 2d 865 (1989). … The Alabama Supreme Court has held that the Double Jeopardy Clause of Art. I[,] § 9, of the Alabama Constitution of 1901, applies to protect <u>only</u> those three areas enumerated in <u>Pearce</u>. <u>See</u> <u>Ex parte Wright</u>, 477 So. 2d 492, 493 (Ala. 1985)."

(Emphasis added.)

Thus, as a general rule, Section 9 provides the same double-jeopardy protection that the Fifth Amendment provides, and, as a result, double-jeopardy analysis by the United States Supreme Court is persuasive when Alabama's appellate courts interpret Section 9. <u>See</u> <u>City of Hoover v. Oliver & Wright Motors, Inc.</u>, 730 So. 2d 608, 613 (Ala. 1999) ("While the United States Supreme Court's interpretation of … the United States Constitution is not binding on this Court when this Court is interpreting ... the Alabama Constitution, that Court's reasoning can inform our judgment."). Indeed, in other double-jeopardy contexts, Alabama already uses a test established by the United States Supreme Court when addressing a double-jeopardy claim under the Alabama Constitution. <u>See</u> <u>Ex parte Wright</u>, 477 So. 2d 492, 493 (Ala. 1985) (noting that, in determining whether two offenses are the same offense for double-jeopardy purposes, "Alabama has applied the <u>Blockburger [v. United States</u>, 284 U.S. 299 (1932),] test … under the Alabama

33

Constitution"). It stands to reason, then, that the <u>Kennedy</u> test should also be applied under the Alabama Constitution – a holding that would be consistent with Alabama's long history of relying on caselaw from the United States Supreme Court when interpreting Section 9. See <u>Curry v. State</u>, 203 Ala. 239, 82 So. 489 (1919) (citing caselaw from the United States Supreme Court in holding that there was no double-jeopardy violation under the Alabama Constitution).

Third, we note that a majority of states – at least 27 – have concluded that the <u>Kennedy</u> standard applies to the double-jeopardy provisions found in their constitutions, statutes, or common law.[5] See <u>State v. Verrill</u>, 175 N.H. 428, 293 A.3d 178 (2022); <u>People v. Viburg</u>, 500 P.3d 1123 (Colo. 2021); <u>City of West Fargo v. Ekstrom</u>, 938 N.W.2d 915 (N.D. 2020); <u>State v. Brown</u>, 236 N.J. 497, 201 A.3d 77 (2019); <u>State v. Bedolla</u>, 298 Neb. 736, 905 N.W.2d 629 (2018); <u>State v. Hodges</u>, 105 N.E.3d 543 (Ohio Ct. App. 2018); <u>Montoya v. State</u>, 386 P.3d 344 (Wyo.

_____

[5]We say that there are at least 27 states in the majority because we have found cases from several additional states that appear to have applied the <u>Kennedy</u> standard to their respective double-jeopardy provisions, like this Court appears to have done in <u>Tomlin</u> and <u>Darling</u>, <u>supra</u>, but did not expressly hold that the standard was the same under their state law.

2016); State v. McCormick, 835 N.W.2d 498 (Minn. Ct. App. 2013); Green v. State, 380 S.W.3d 368 (Ark. 2011); Ex parte Lewis, 219 S.W.3d 335 (Tex. Crim. App. 2007); State v. O'Connor, 936 A.2d 216 (R.I. 2007); State v. Michael J., 274 Conn. 321, 875 A.2d 510 (2005); Poff v. State, 881 So. 2d 564 (Fla. Dist. Ct. App. 2004); State v. Williams, 268 Kan. 1, 988 P.2d 722 (1999); Bennefield v. Commonwealth, 21 Va. App. 729, 467 S.E.2d 306 (1996); Davis v. Brown, 87 N.Y.2d 626, 641 N.Y.S.2d 819 (1996); Thanos v. State, 330 Md. 576, 590, 625 A.2d 932, 938 (1993); State v. Walker, 332 N.C. 520, 422 S.E.2d 716 (1992); State v. Cochran, 51 Wash. App. 116, 751 P.2d 1194 (1988); State v. Oliver, 188 Ga. App. 47, 372 S.E.2d 256 (1988); State v. Rademacher, 433 N.W.2d 754 (Iowa 1988); Bailey v. State, 521 A.2d 1069 (Del. 1987); State v. Pennington, 179 W. Va. 139, 365 S.E.2d 803 (1987); People v. Ramirez, 114 Ill. 2d 125, 500 N.E.2d 14 (1986); State v. Tucker, 728 S.W.2d 27 (Tenn. Crim. App. 1986); State v. Chapman, 496 A.2d 297 (Me. 1985); and Stamps v. Commonwealth, 648 S.W.2d 868 (Ky. 1983).

Flynn does not acknowledge this majority but, as noted, points to the fact that six other states have reached the opposition conclusion, holding that their state constitutions provide broader double-jeopardy

protection than the narrow <u>Kennedy</u> standard affords. See <u>Thomas v. Eighth Jud. Dist. Ct.</u>, 133 Nev. 468, 402 P.3d 619 (2017); <u>State v. Jorgenson</u>, 198 Ariz. 390, 10 P.3d 1177 (2000); <u>State v. Rogan</u>, 91 Haw. 405, 984 P.2d 1231 (Haw. 1999); <u>State v. Breit</u>, 122 N.M. 655, 930 P.2d 792 (1996); <u>Commonwealth v. Smith</u>, 532 Pa. 177, 615 A.2d 321 (1992); and <u>People v. Dawson</u>, 154 Mich. App. 260, 397 N.W.2d 277 (1986).[6] Those courts held that the double-jeopardy provisions in their state constitutions bar the retrial of a defendant who seeks and is granted a mistrial based on intentional prosecutorial misconduct that is so prejudicial that it could be remedied only by a mistrial, regardless of whether the State intended to provoke a mistrial. However, Flynn makes no attempt to explain why those states have a better argument than the states in the majority, nor does he make any other attempt to explain why we should place Alabama in the minority, other than the fact that

---

[6]Flynn has also cited <u>Bauder v. State</u>, 921 S.W.2d 696 (Tex. Crim. App. 1996), and <u>State v. White</u>, 85 N.C. App. 81, 354 S.E.2d 324 (1987). However, <u>Bauder</u> was overruled by <u>Ex parte Lewis</u>, <u>supra</u>, which brought Texas into the majority on this issue. <u>White</u> was affirmed by the North Carolina Supreme Court in <u>State v. White</u>, 322 N.C. 506, 369 S.E.2d 813 (1988), but, in affirming the intermediate appellate court, the Court held that the <u>Kennedy</u> standard was applicable under the North Carolina Constitution, thus bringing North Carolina into the majority on this issue.

doing so provides him with a greater chance for relief. Nevertheless, this Court has reviewed those six cases and is unpersuaded by the minority's reasoning.

In reviewing the cases Flynn has cited, the most pervasive criticism of the <u>Kennedy</u> standard has been that a prosecutor's intent to provoke a mistrial is simply too difficult, if not impossible, to prove. It is true that, "because intent is a state of mind, it is rarely susceptible of direct or positive proof," <u>Pilley v. State</u>, 930 So. 2d 550, 564 (Ala. Crim. App. 2005), but it does not follow that intent is too difficult, much less impossible, to prove. Indeed, "juries decide questions of 'intent' all the time," <u>Tucker</u>, 728 S.W.2d at 32, and routinely find that intent has been established beyond a reasonable doubt based on the evidence presented to them. We fail to see why it would be any more difficult for a jury or a trial court to determine, based on the circumstances, whether a prosecutor intentionally provoked a mistrial. <u>See</u> <u>id.</u> at 31 (noting that a prosecutor's intent to provoke a mistrial can be inferred from the circumstances, such as when "the case is collapsing around the prosecutor because the witnesses are weaker than expected, adverse rulings have kept out important evidence, or key witnesses cannot be found or did not appear").

We also note that it is not clear what standard of proof applies when determining whether a prosecutor intentionally provoked a mistrial. See Breit, 122 N.M. at 663, 930 P.2d at 800 (noting that it is "unclear what standards of proof would be appropriate" when a defendant seeks to prove that the State intentionally provoked him into moving for a mistrial). However, it is certainly not a higher standard than proof beyond a reasonable doubt, which fact-finders routinely conclude has been satisfied when resolving questions of intent, and it might be something less. Thus, we find no merit to the argument that the alleged difficulty in proving a prosecutor's intent to provoke a mistrial is a basis for rejecting the Kennedy standard.

A second criticism of the Kennedy standard has been that it does not fully protect a defendant's right to have his trial completed by the original tribunal. However, this particular aspect of double jeopardy is primarily implicated when a mistrial is declared over the defendant's objection. See Ex parte Head, 958 So. 2d 860, 866 (Ala. 2006) ("Where, as here, a mistrial has been declared over the defendant's objection, the defendant's 'valued right to have his trial completed by a particular tribunal' is also implicated." (quoting Wade v. Hunter, 336 U.S. 684, 689

(1949)) (emphasis added)). When a mistrial is declared <u>on the defendant's motion</u>, he generally forfeits his right to have his trial completed by the original tribunal. <u>See</u> <u>Kinard v. State</u>, 495 So. 2d 705, 708 (Ala. Crim. App. 1986) (noting that a defendant may not rely on double jeopardy "to relieve himself from the consequences of his voluntary choice"). Thus, the limited <u>Kennedy</u> standard, which applies only when the defendant has been provoked into moving for a mistrial, provides a proper balance between a defendant's right to have his trial completed by the original tribunal and the rule that a defendant cannot benefit from the consequences of his voluntary choice.

We are not persuaded by the minority's criticism of the <u>Kennedy</u> standard, and we feel compelled to make one final point here. Even if this Court believed that the <u>Kennedy</u> standard is too narrow, which we do not, that belief would not be a sufficient basis for holding that Section 9 provides broader double-jeopardy protection than the Fifth Amendment provides. The Alabama Constitution "is a document <u>of the people</u>," not of this, or any, Court. <u>McGee v. Borom</u>, 341 So. 2d 141, 143 (Ala. 1976) (emphasis added). It would therefore be improper for this Court to hold that Section 9 provides broader double-jeopardy protection than the Fifth

Amendment provides simply because the Court, relying on nothing more than its own intuition, says it does. Taking that approach would allow this Court, at any point in time, to "find" or "read into" the Alabama Constitution anything that its judges might <u>desire</u> the constitution to say, rather than seeking to determine what it <u>does</u> say as ratified by the people, and this Court will not employ that type of reckless approach to constitutional interpretation. See <u>Barnett v. Jones</u>, 338 So. 3d 757, 766 (Ala. 2021) (Mitchell, J., concurring specially) (noting that an approach to constitutional interpretation that seeks "to fit contemporary policy preferences" would allow courts to "improperly chang[e] the law").

Rather, when interpreting a provision of the Alabama Constitution, our duty is to seek to discover the original public meaning of the provision, i.e., "'the meaning <u>the people</u> understood [the] provision to have at the time they enacted it.'" <u>Barnett</u>, 338 So. 3d at 767 (Mitchell, J., concurring specially) (quoting <u>Olevik v. State</u>, 302 Ga. 228, 235, 806 S.E.2d 505, 513 (2017)). One Justice on the Alabama Supreme Court has aptly explained how this original public meaning can be discovered:

> "When seeking to determine the original public meaning of a constitutional provision, it is necessary to examine relatively contemporaneous sources and older, pre-enactment sources that shed light on a provision's historical context. See

40

[Antonin] Scalia & [Bryan A.] Garner, <u>Reading Law[:The Interpretation of Legal Texts</u>] § 69 at 400-02 [(Thompson/West 2012)]; III Roscoe Pound, <u>Jurisprudence</u> 491 (1959) ('In the case of constitutional provisions historical interpretation is often necessary.'). Further, research should include the examination of more than one source to capture a more accurate understanding of what terms would have meant to the informed public. <u>Cf.</u> <u>Tutt Real Estate</u>, 334 So. 3d at 1254 (Mitchell, J., concurring specially) (cautioning against the use of a single, modern dictionary to determine the meaning of a statutory phrase first adopted in 1923).

"Logically, … concerning a provision from the Alabama Constitution of 1901, some think to consult the records of the 1901 Constitutional Convention to find evidence of meaning. And while those records are certainly one source that can reveal the common understanding of provisions at the time, 'they are not the exclusive documents to which we may refer.' <u>Smith [v. Baptiste</u>], 287 Ga. [23,] 32, 694 S.E.2d [83,] 90 [(2010)] (Nahmias, J., concurring specially). Nor should they be. Much like legislative history can be cherry-picked to find remarks favorable to a particular interpretation of a statute, records of constitutional conventions can be similarly abused. <u>Cf.</u> <u>Conroy v. Aniskoff</u>, 507 U.S. 511, 519, 113 S. Ct. 1562, 123 L. Ed. 2d 229 (1993) (Scalia, J., concurring in the judgment) (likening the use of legislative history to looking over a crowd to find one's friends). So it is also important to consider 'contemporaneous dictionaries, legal treatises, and cases, as well as histories of the period,' to get a full scope of the relevant terms' public meaning. <u>See</u> <u>Smith</u>, 287 Ga. at 32, 694 S.E.2d at 90 (Nahmias, J., concurring specially).

"….

"Less well known, but equally significant, is how several state supreme courts interpret their own constitutions based on original public meaning. <u>See, e.g.</u>, <u>Elliott v. State</u>, 305 Ga. 179, 181, 824 S.E.2d 265, 268 (2019) ('We have often explained

that we interpret the Georgia Constitution according to its original public meaning.'); State v. Antonio Lujan, 459 P.3d 992, 999 (Utah 2020) ('We have repeatedly reinforced the notion that the Utah Constitution is to be interpreted in accordance with the original public meaning of its terms at the time of its ratification.'); Rafaeli, LLC v. Oakland Cnty., 505 Mich. 429, 456, 952 N.W.2d 434, 450-51 (2020) ('Our "primary objective" in interpreting a [state] constitutional provision ... is "to determine the text's original meaning to the ratifiers, the people, at the time of ratification."' (citation omitted))."

Barnett, 338 So. 3d at 767-68 (Mitchell, J., concurring specially). See also State v. Sayre, 118 Ala. 1, 28, 24 So. 89, 92 (1897) ("There can be no just [constitutional] construction or interpretation ... which is not deduced, not only from the words, but from the history, of any particular part or provision of the instrument."). Although the task of locating these historical sources and scouring them for evidence of original public meaning "can be arduous, ... rarely is it impossible. See [Antonin] Scalia & [Bryan A.] Garner, Reading Law[: The Interpretation of Legal Texts] § 69 at 399 [(Thompson/West 2012)] (dismantling '[t]he false notion that lawyers and judges ... are unqualified to do the historical research originalism requires')." Barnett, 338 So. 3d at 767 (Mitchell, J., concurring specially).

Flynn, however, has not provided this Court with any historical evidence to support his proposed interpretation of Section 9, and "it is neither this Court's duty nor its function to perform an appellant's legal research." City of Birmingham v. Business Realty Inv. Co., 722 So. 2d 747, 752 (Ala. 1998). "An appellate court is not a depository in which a party may dump the burden of argument and research." State v. Hamilton, 437 P.3d 530, 535 (Utah 2018) (citation omitted). Nevertheless, we have reviewed the records of the Constitutional Convention of 1819, which promulgated Alabama's original double-jeopardy clause, and the records of the Constitutional Convention of 1901, which promulgated Section 9, and we find no basis in those records for interpreting Section 9 more broadly than the United States Supreme Court has interpreted the Fifth Amendment.[7]   If there are other historical sources that support a different conclusion, Flynn has not directed us to them, and, in reviewing the six cases he cites from other jurisdictions, we find no indication that the courts' decisions were based

---

[7]Alabama's original double-jeopardy provision stated: "No person shall, for the same offense, be twice put in jeopardy of life or limb." Art. I, § 13, Ala. Const. 1819. That provision remained unchanged in the next four constitutions (1861, 1865, 1868, and 1875) and was then amended in 1901 to provide the current double-jeopardy provision.

on the original public meaning of those states' double-jeopardy provisions. On the other hand, courts in several of the states that are in the majority on this issue have conducted the kind of historical analysis that should guide constitutional interpretation. See, e.g., Ekstrom, supra; Ex parte Lewis, supra; and Michael J., supra.

We now expressly hold, for the foregoing reasons, that the Kennedy standard applies to double-jeopardy claims under the Alabama Constitution. Thus, Section 9 does not bar retrial of a defendant following a mistrial that was granted on the defendant's motion, unless the record indicates that the State intentionally provoked the defendant into moving for the mistrial. In this case, we have already concluded that the record does not support a finding that the State intentionally provoked Flynn into moving for a mistrial in his first trial. Accordingly, Section 9 did not bar the State from bringing Flynn to trial a second time.

## II. Use of a Witness's Prior Conviction for Impeachment

Flynn claims that the trial court erred by prohibiting him from impeaching Webster's credibility with evidence indicating that Webster has been convicted of lying to a police officer. Our review of this claim is limited to determining whether the trial court exceeded its discretion by

excluding Webster's conviction.  <u>Floyd v. State</u>, 289 So. 3d 337, 395 (Ala. Crim. App. 2017).

Rule 609(a)(B)(2), Ala. R. Evid., states: "For the purpose of attacking the credibility of a witness, … evidence that any witness has been convicted of a crime shall be admitted if it involved dishonesty or false statement, regardless of the punishment."  However, Rule 609(b), Ala. R. Evid., states:

> "Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date, unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect.  However, evidence of a conviction, more than ten years old as calculated herein, is not admissible unless the proponent gives to the adverse party sufficient advance written notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence."

In this case, it is undisputed that Webster's conviction was more than 10 years old.  Thus, the conviction was inadmissible unless the trial court found both that its probative value substantially outweighed its prejudicial effect <u>and</u> that Flynn had provided the State with "sufficient advance written notice" of his intent to use the conviction.  Rule 609(b).

45

The trial court found that Flynn had failed to comply with that notice requirement, and Flynn argues on appeal that the notice he provided was sufficient to give the State "a fair opportunity to contest the use of" the conviction. Id.

We have not found an Alabama case that provides any guidance as to what constitutes "sufficient advance written notice" as required by Rule 609(b). However, in Green v. State, 339 Ga. App. 263, 270, 793 S.E.2d 156, 162 (2016), the Georgia Court of Appeals considered that issue under Georgia's counterpart to Rule 609(b), which also requires "sufficient advance written notice" of a party's intent to use a witness's conviction to impeach the witness's credibility. OCGA § 24-6-609(b). In that case, the defendant's trial began on a Monday, and, at 1:24 p.m. on the preceding Thursday, he provided the State with written notice that he intended to impeach the credibility of one its witnesses with evidence of the witness's conviction. The trial court refused to admit the conviction, however, finding that notice provided "'11 business hours' before the start of trial was insufficient to meet the notice requirement for use of an old conviction," and the Court of Appeals held that there was

no abuse of discretion in the trial court's ruling. <u>Green</u>, 339 Ga. App. at 270, 793 S.E.2d at 162.

In this case, Flynn's trial also began on a Monday, and he filed written notice of his intent to use Webster's conviction at 9:01 p.m. on the preceding Saturday. (C. 286.) Thus, Flynn filed his notice closer to the start of trial than did the defendant in <u>Green</u>, and, because he filed the notice on a Saturday, he did not provide the State with any "business hours" notice. <u>Green</u>, 339 Ga. App. at 270, 793 S.E.2d at 162. Accordingly, we cannot say that the trial court exceeded its discretion by finding that Flynn had failed to comply with the notice required by Rule 609(b).

Alternatively, Flynn claims that the trial court erred by prohibiting him from simply asking Webster on cross-examination if he had ever lied to the police, without making any reference to Webster's conviction for that offense. According to Flynn, that ruling violated his right to confront his accuser, <u>see</u> U.S. Const., Amend. VI, and his right to present a complete defense. However, even if the trial court erred in this regard, and we do not suggest that it did, Flynn is not entitled to relief.

47

A trial court's erroneous limitation on a party's cross-examination is subject to a harmless-error analysis. Bohannon v. State, 222 So. 3d 457, 486 (Ala. Crim. App. 2015).

> "'The correct inquiry [in the harmless-error analysis] is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. Those factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.'"

Id. at 486-87 (quoting Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986)). To find harmless error in this context, this Court must be "convinced beyond a reasonable doubt that any error in the trial court's limitation on … cross-examination … did not contribute to the jury's verdict." Floyd, 289 So. 3d at 389.

The purpose of the question Flynn sought to ask Webster – whether Webster has "ever lied to law enforcement officers" – was to cast doubt on Webster's credibility. Although the trial court prohibited Flynn from asking that question, the court did allow Flynn to demonstrate that

Webster had lied in the statement he gave to the police regarding Morris's murder. (R. 262-63.) The fact that Webster lied to the police in this case certainly cast as much doubt on his credibility, if not more, than an admission that he had lied to the police at some point in the past regarding an unrelated matter. Furthermore, the only incriminating part of Webster's testimony was that other people had told him that Flynn shot Morris and that he had heard Flynn admit to shooting Morris, but Hale and Watts, respectively, provided identical testimony. Thus, even if Flynn had been able to completely discredit Webster as a witness, there is not a reasonable likelihood that doing so would have impacted the jury's verdict.[8] Accordingly, this Court is convinced beyond a reasonable doubt that the trial court's limitation on Flynn's cross-examination of Webster was harmless error if it was error at all, which does not entitle Flynn to relief. See Peoples v. State, 951 So. 2d 755, 762 (Ala. Crim. App. 2006) (holding that any error in the trial court's limitation on cross-examination was harmless because the witness's own

---

[8]Recognizing that Webster's testimony was cumulative of Watts's testimony, Flynn argues that "to impeach Webster was to impeach Watts." (Flynn's reply brief, p. 12.) However, Flynn fails to make any cogent argument as to why Watts's credibility should have hinged upon Webster's credibility.

testimony "placed his credibility at issue" and because his testimony implicating the defendant was "essentially the same" as the testimony of another witness).

### III. Hearsay

Flynn claims that the trial court erred by allowing Hale and Webster to testify that other people had told them that Flynn shot Morris because, Flynn says, the declarants' out-of-court statements were inadmissible hearsay. The State argues that the trial court correctly found the declarants' statements to be admissible under the excited-utterance exception to the rule against hearsay. See Rule 803(2), Ala. R. Evid.

In Jackson v. State, 305 So. 3d 440 (Ala. Crim. App. 2019), this Court stated:

"'Hearsay' is defined in Rule 801, Ala. R. Evid., as 'a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.' Hearsay is generally not admissible unless it falls within one of the exceptions in Rule 803, Ala. R. Evid., or Rule 804, Ala. R. Evid. See Rule 802, Ala. R. Evid. An excited utterance is an exception to the hearsay rule. Rule 803(2), Ala. R. Evid., defines an excited utterance as '[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.'

> "'"This rule [Rule 803(2), Ala. R. Evid.] sets out three conditions which must be met for admission of the statement. There must be a startling event or condition, the statement must relate to the circumstances of the occurrence and the statement must be made before time has elapsed sufficient for the declarant to fabricate. The statement must be the apparently spontaneous product of that occurrence operating upon the visual, auditory, or other perceptive sense of the speaker. The declaration must be instinctive rather than deliberative. In short, it must be the reflex product of the immediate sensual impressions, unaided by retrospective mental action. Whether a statement qualifies as an excited utterance is a preliminary and discretionary question for the trial court."'
>
> "A.C.M. v. State, 855 So. 2d 571, 575 (Ala. Crim. App. 2002) (quoting Charles W. Gamble, McElroy's Alabama Evidence 265.01(1) (5th ed. 1996) (footnotes omitted))."

Jackson, 305 So. 3d at 471-72. "'The critical factor [in determining whether a statement qualifies as an excited utterance] is whether the person who made the statement is still under the influence of the emotions arising from the startling event.'" Ex parte C.L.Y., 928 So. 2d 1069, 1072-73 (Ala. 2005) (quoting Charles W. Gamble, McElroy's Alabama Evidence § 265.01(2) (5th ed. 1996)).

Hale was present when Morris was shot but could not identify the shooter. However, when he heard the initial shot, Hale ran back into his

house to retrieve his gun, and, when he came back outside, "there was people … firing toward down the street." (R. 193.) According to Hale, those people were "amped up" and "very mad" (R. 197) and were "saying it was [Flynn] … who shot [Morris]." (R. 198.) Hale also testified that those events occurred within the span of "two [or] three minutes." (R. 196.) Thus, the record clearly supports the conclusion that the declarants were "still under the influence of the emotions arising from [a] startling event" when they told Hale that Flynn had shot Morris – a statement that was directly related to the startling event. Ex parte C.L.Y., 928 So. 2d at 1072-73 (citation omitted). Accordingly, the declarants' statements fit within the excited-utterance exception to the rule against hearsay and were therefore admissible. See Jackson v. State, 177 So. 3d 911, 931 (Ala. Crim. App. 2014) (holding that the declarant's statement constituted an excited utterance because it occurred less than five minutes after he had been involved in a startling event, he appeared to be "frantic" and "excited" at time of the statement, and the statement was "directly related to the" startling event).

Webster was not present when Morris was shot, but he heard the shooting from his house approximately three blocks away. According to

Morris, "within two or three minutes after [he] heard the gunshots," two of his family members telephoned him, and they were "upset" and "worked up." (R. 248-49.) Before allowing the State to ask Webster what those family members had told him, the trial court asked Webster if the declarants were "at the scene," and Webster testified that they were. (R. 249.) The trial court then allowed the State to elicit Webster's testimony that the two family members had told him that Flynn shot Morris. Thus, at the time the trial court admitted those statements into evidence, the facts indicated that the statements were admissible under the excited-utterance exception to the rule against hearsay because they were directly related to a startling event and had been made by declarants who were "still under the influence of the emotions arising from the startling event." Ex parte C.L.Y., 928 So. 2d at 1072-73 (citation omitted).

Flynn correctly notes that, on cross-examination, Webster testified that the family members who had telephoned him were not present when Morris was murdered; rather, they had merely told him what some unidentified declarant or declarants had told them. (R. 261.) It is not clear whether Alabama law allows an excited utterance to stem from what the declarant merely heard about a startling event, but we need not

make that determination in this case. As we have just explained, <u>at the time the trial court admitted the challenged statements into evidence</u>, the facts before the court indicated that the statements fit within the excited-utterance exception to the rule against hearsay. Thus, the trial court's ruling was not erroneous, and, when Webster later clarified that his family members were not present when the crime occurred, Flynn did not move to strike their statements from evidence. Once allegedly inadmissible testimony has been admitted, a challenge to that testimony is not preserved for appellate review unless the defendant moves to strike the testimony and obtains an adverse ruling from the trial court. <u>Glass v. State</u>, 14 So. 3d 188, 194 (Ala. Crim. App. 2008). Accordingly, there is no basis for holding the trial court in error for admitting Webster's family members' statements. Moreover, those statements were cumulative of the statements made by the declarants at Hale's party, and the "'[t]he erroneous admission of evidence that is merely cumulative is harmless error.'" <u>Gobble v. State</u>, 104 So. 3d 920, 959 (Ala. Crim. App. 2010) (quoting <u>Dawson v. State</u>, 675 So. 2d 897, 900 (Ala. Crim. App. 1995)). Therefore, even if Webster's family members' statements were inadmissible, their admission does not entitle Flynn to relief.

## IV. Jury Instruction

Flynn claims that the trial court erred by giving the following jury instruction, which the State requested:

"Any act proving or tending to prove an effort or desire on the part of the defendant to destroy evidence of a crime is relevant. From such evidence, if unexplained, the jury may justly infer a consciousness of guilt."

(R. 565-66.) In reviewing this claim, we keep in mind that a trial court "'has broad discretion in formulating its jury instructions, provided those instructions accurately reflect the law and the facts of the case.'" Floyd, 289 So. 3d at 438 (quoting Pressley v. State, 770 So. 2d 115, 139 (Ala. Crim. App. 1999)).

Flynn argues that the State's requested instruction was improper because, he says, there was no evidence indicating that he had destroyed evidence of the crime, and he argues that "a presumption of destruction cannot arise from the mere fact that a weapon was not found." (Flynn's brief, p. 64.) However, the State's evidence indicated that Flynn shot Morris at Hale's party; that Flynn was observed leaving the crime scene with a gun; that, shortly thereafter, Flynn went to Webster's house, which was only a few blocks from the murder scene; and that Flynn was not in possession of a gun at that time. Though circumstantial, that

evidence supported an inference that Flynn had disposed of the murder weapon – an inference that is strengthened by Flynn's statements that he would not surrender himself to the police and that the police were "going to have to catch [him]." Thus, we cannot say that the trial court exceeded its discretion by instructing the jury that it could infer Flynn's consciousness of guilt if it found that he had destroyed evidence of the crime.

Furthermore, any error in giving that instruction does not entitle Flynn to relief. This Court has explained that "'faulty jury instructions are subject to harmless error review.'" Bohannon, 222 So. 3d at 510 (quoting State v. Williams, 364 Wis. 2d 126, 149, 867, N.W.2d 736, 746 (2015)). "In order to determine that an error in jury instructions was harmless, this Court considers the totality of the circumstances and must be able to conclude beyond a reasonable doubt that the jury's verdict would have been the same even if the … instruction had [not] been given." Darby v. State, [Ms. CR-20-0919, March 24, 2023] ___ So. 3d ___, ___ (Ala. Crim. App. 2023). See Simmons v. State, 797 So. 2d 1134, 1173 (Ala. Crim. App. 1999) (holding that any error in the trial court's jury

instruction was harmless because there was "no doubt that had the jury been instructed properly, it would still have returned" the same verdict).

The evidence against Flynn was overwhelming. Multiple people at Hale's party stated that they saw Flynn shoot Morris, and Flynn admitted to two different people that he had shot Morris. Given that evidence, it would be incredible to conclude that the jury's verdict hinged on a finding that Flynn had destroyed evidence of the crime. Thus, this Court is convinced that the jury would have returned the same verdict even if the trial court had not explained that a defendant's destruction of evidence could be construed as consciousness of his guilt. Accordingly, any error in giving that instruction was harmless and therefore does not entitle Flynn to relief. See Ex parte T.D.T., 745 So. 2d 899, 904 (Ala. 1999) (holding that any error in the trial court's instructions did not "call into question the jury's verdict" because the evidence against the defendant was overwhelming).

## Conclusion

Flynn has not demonstrated that any reversible error occurred in his trial. Thus, Flynn's conviction and sentence are affirmed.

AFFIRMED.

Windom, P.J., and Kellum and Minor, JJ., concur.  Cole, J., concurs in the result.